# UNITED STATES v. MICHIGAN.

ORIGINAL. IN EQUITY.

No. 11. Argued April 20, 21, 1903.—Decided June 1, 1903.

The effect of the legislation of Congress granting a right of way through a military reservation and 750,000 acres of public lands to be sold by the State of Michigan and the proceeds applied, under the conditions prescribed, to the construction of the St. Mary's River canal, and of the legislation of the State of Michigan in regard to the construction, maintenance and surrender of the canal to the United States, as the same are set forth in the complaint, was to create a trust, of which the State of Michigan was the trustee, to construct and maintain the canal as a work of national importance, and the State of Michigan acquired no individual beneficial interest therein. When the canal was surrendered to the United States by the State the Federal Government was entitled to whatever surplus remained in the hands of the State from the tolls collected over and above the expenses of maintenance and also to the value of the tools and materials connected with the canal at the time of the surrender.

THE United States, by leave of court, duly filed in this court its original bill in equity against the State of Michigan, to which bill the defendant has filed a demurrer substantially for want of equity, and also because it appears therefrom that the complainant has been guilty of gross laches in regard to the matters therein set forth. It will be most convenient to set forth the bill with the exception of some portions thereof which do not seem to be material, and it is as follows:

" *To the Chief Justice and the Associate Justices of the Supreme Court of the United States, in equity:*

"Philander C. Knox, Attorney General of the United States of America, for and in behalf of said United States, brings this

bill of complaint against the State of Michigan, and thereupon
your orator complains and says:

## "*First.*

· "That the said State of Michigan, for some years previous
to the date first hereinafter mentioned; was desirous of procur-
ing the construction of a canal and lock in the Saint Marys
River, at or near Saint Marys Falls, where Lake Superior
empties into said river, and did at various times, by joint resolu-
tions of the legislature thereof, importune the Congress of the
United States to construct such a canal and lock on the Mich-
igan side of said river, and was able, through the influence of
its Senators and Representatives in Congress from said State,
with the coöperation and influence of other States which might
become directly affected in a desirable manner, to cause and
procure said Congress to pass a law, which became operative
on the 26th day of August, 1852, appropriating to the State of
Michigan 750,000 acres of land, to be afterwards selected, to
construct such ship canal and lock. Said act is in terms as
follows:

"' *Be it enacted by the Senate and House of Representatives of
the United States of America in Congress assembled,* That there
be, and is hereby, granted to said State the right of locating a
canal through the public lands known as the military reserva-
tion at the Falls at Saint Marys River in said State, and that
four hundred feet of land in width, extending along the line
of such canal be, and the same is hereby, granted, to be used by
said State, or under the authority thereof, for the construction
and convenience of such canal, and the appurtenances thereto
and the use thereof is hereby vested in said State forever for
the purposes aforesaid and no other: *Provided,* That in locat-
ing the line of said canal through said military reservation the
same shall be located on the line of the survey heretofore made
for that purpose, or such other route between the waters above
and below said falls, as, under the approval of the Secretary of
War, may be selected: *And provided further,* That said canal
shall be at least one hundred feet wide, with a depth of water

twelve feet, and the locks shall be at least two hundred and fifty feet long and sixty feet wide.

" 'SEC. 2. *And be it further enacted,* That there be, and hereby is, granted to the said State of Michigan, for the purpose of aiding said State in constructing and completing said canal, seven hundred and fifty thousand acres of public lands, to be selected in subdivisions, agreeably to the United States surveys, by an agent or agents to be appointed by the governor of said State, subject to the approval of the Secretary of the Interior, from any land within said State subject to private entry.

" 'SEC. 3. *And be it further enacted,* That the said lands hereby granted shall be subject to the disposal of the legislature of said State for the purposes aforesaid and no other ; and the said canal shall be and remain a public highway for the use of the Government of the United States, free from toll or other charge upon the vessels of said Government engaged in the public service, or upon vessels employed by said Government in the transportation of any property or troops of the United States.

" 'SEC. 4. *And be it further enacted,* That if the said canal shall not be commenced within three and completed within ten years, the said State of Michigan shall be bound to pay to the United States the amount which may be received upon the sale of any part of said lands by said State, not less than one dollar and twenty-five cents per acre, the title to the purchasers under said State remaining valid.

" 'SEC. 5. *And be it further enacted,* That the legislature of said State shall cause to be kept an accurate account of the sales and net proceeds of the lands hereby granted and of all expenditures in the construction, repairs and operating of said canal and of the earnings thereof, and shall return a statement of the same annually to the Secretary of the Interior ; and whenever said State shall be fully reimbursed for all advances made for the construction, repairs and operating of said canal, with legal interest on all advances, until the reimbursement of the same, or upon payment by the United States of any balance of such advances over such receipts from said lands and canal, with such interest, the said State shall be allowed to tax for the use of said canal

only such tolls as shall be sufficient to pay all necessary expenses for the care, charge and repairs of the same.

" 'SEC. 6. *And be it further enacted*, That before it shall be competent for said State to dispose of any of the lands to be selected as aforesaid, the route of said canal shall be established as aforesaid, and a plat or plats thereof shall be filed in the office of the War Department, and a duplicate thereof in the office of the Commissioner of the General Land Office.

" ' Approved, August 26, 1852.'

" And your orator further shows that the legislature of the State of Michigan afterwards passed an act providing for the construction of a ship canal around the Falls of Saint Mary, the same being number thirty-eight of the session laws of the State of Michigan for the year 1853. By this act the appropriation of land made by Congress as aforesaid was accepted, with all conditions therein expressed attached, and made obligatory upon the State of Michigan. By its said act, also, the governor was authorized to appoint a board of five commissioners and an engineer for the purpose of looking after the construction of said canal and lock; provisions were made relative to the contract proposed to be entered into for the construction of the canal; the expenses of surveying, locating and constructing the same; the manner in which the expenses attendant upon such construction should be paid, which was substantially out of the lands so appropriated by Congress; the keeping of accounts connected with such construction; the turning out of lands to the contractor and subcontractor, and other matters connected with such work, such act being in terms as follows:

" 'SECTION 1. *The People of the State of Michigan enact*, That the act of Congress entitled " An act granting to the State of Michigan the right of way and a donation of public land for the construction of a ship canal around the Falls of Saint Mary, in said State," approved August 26, 1852, is hereby accepted, and all conditions expressed in said act are hereby agreed to and made obligatory upon the State of Michigan.

" 'SEC. 2. For the purpose of carrying out the objects of said act, the governor is hereby authorized, by and with the advice and consent of the senate, to appoint five commissioners and an en-

gineer, who shall prepare a plan for the construction of said canal in conformity with the provisions of said act of Congress and this act, to be approved by the governor, and who shall have the entire and absolute control and supervision of the construction of said canal.

*      *      *      *      *      *      *      *

" 'SEC. 3. The said commissioners shall receive proposals for the construction of said canal, agreeable to said plan, and, in deciding upon said proposals, are required to take into consideration the responsibility of the person or persons offering to contract for the same, and his or their ability to carry into effect the object and intention of said act of Congress, by constructing said canal in the best and most expeditious manner; and said commissioners, in making said contract, shall require good and ample security for the performance thereof.

*      *      *      *   .  *      *      *      *

" 'SEC. 5.  .  .  .  The cost of locating the said canal, and all expenses of every kind incidental to the supervision of the construction and completion of said canal, shall be reimbursed by the contractors as fast as ascertained, and shall be paid by them into the state treasury and under the direction of said commissioners. When, and as fast as the lands shall have been selected and located, and accurate description thereof, certified by the persons appointed to select the same, shall be filed in the office of the commissioner of the state land office, whose duty it shall be to transmit to the Commissioner of the General Land Office a true copy of said list and to designate and mark upon the books and plats in his office the said lands as Saint Mary canal lands.

" 'SEC. 6. The commissioners shall require said canal to be constructed and completed within two years from making the contract; and on the completion of the same within said period to their satisfaction and acceptance and the satisfaction of the governor and engineer, they shall have a certificate thereof to be signed by the commissioners, governor and engineer, and filed in the office of the commissioner of the state land office. Thereupon it shall be the duty of the said commissioner of the state land office forthwith to make certificates of purchase for so much of said lands as by the terms of the contract for

the construction of said canal are to be conveyed for the purpose of defraying its costs and the expenses hereinbefore provided, which certificates shall run to such persons and for such portions cf said lands so selected and to be conveyed as the contractor may designate, and shall forthwith be delivered to the secretary of state, and patents shall immediately be issued thereon, as in other cases.

"'S. 7. That the said commissioners shall keep an accurate account of the sales and net proceeds of the lands granted by said act of Congress, and of all expenditures in the construction of said canal, and the earnings thereof, and on or before the first Monday in October in each year return a statement thereof to the governor, whose duty it shall be to return the same, or a copy thereof, to the Secretary of the Interior, at Washington, as required by said act of Congress.

\* \* \* \* \* \* \* \*

"' Sec. 9. For the selection of the lands granted by Congress, as aforesaid, for the construction of said canal, the governor shall appoint agents, in pursuance of said act. He shall give notice to the person or persons contracting under this act to construct said canal, to recommend to him suitable persons to make such selections; and he shall appoint such agents from the persons so recommended, if, in his judgment, suitable and proper persons for that purpose.

\* \* \* \* \* \* \* \*

"' Approved, February 5, 1853.'

"*Second.*

" Your orator shows that the lands so appropriated were duly selected and certified to the State of Michigan, and that he is informed and verily believes, and so charges the fact to be, that the lands so appropriated were all sold and disposed of in some manner by the State of Michigan, and that at some time subsequent to such selection and certification said State of Michigan constructed, or caused to be constructed, and put into operation the canal and lock so appropriated for, but that the said State of Michigan did not report to the Secretary of the Interior, as required by the terms of section 5 of said act of

Congress, an accurate account of the sales and net proceeds of the lands granted and of all expenditures in the construction, repairs and operating of said canal, and of the earnings thereof ; but, on the contrary, your orator shows that after diligent search and inquiry in the office of the Secretary of the Interior, to whom such annual reports should have been made, no such reports can be found on file, and no record or memoranda indicating that any report or reports, such as were provided for in said section, were ever made, so that your orator is unable to state in what manner said lands were sold or disposed of, or whether all the proceeds thereof were in fact devoted to the construction, control and management of said canal, as in said act provided.

### " *Third.*

" Your orator further shows that by an act of the legislature of the State of Michigan, approved February 12, 1855, a superintendent was authorized to be appointed by the governor of the State of Michigan, with the advice and consent of the senate thereof, his salary fixed, and the manner of keeping record of the vessels navigating said canal and passing through said lock, as well as the tolls to be collected and the keeping of accounts, were all provided for ; that from the completion of said canal and lock the same were controlled, operated and managed by the State of Michigan, and that during the entire management of the same by said State, as your orator is informed and verily believes and therefore charges the fact to be, no funds belonging to the State of Michigan were ever permanently invested or involved in such control, operation and management, but, on the contrary, said canal was wholly constructed from the appropriation of such lands so made by the United States aforesaid, and was managed, controlled, repaired and maintained from the amounts collected as tolls from the vessels passing through said canal and lock during the several years when said State of Michigan was in such control thereof.

### " *Fourth.*

" And your orator further shows that he is informed and verily believes, and therefore charges the fact to be, that during

such management and control by the State of Michigan there were from time to time moneys collected in the form of tolls in excess of the amounts actually used at the period of such collection, and that this was done without intention on the part of the State of Michigan to make a profit from the management and control of said canal in violation of the act of Congress hereinbefore quoted, but for the purpose of having cash on hand to make repairs either during the season when the canal was closed to navigation or any time when so needed, and that said fund gradually increased in amount with the increasing volume of commerce through the canal until finally, at the time when the canal was turned over to the United States, there was in the treasury of the State of Michigan belonging to the fund of said canal, not appropriated or the expenditure thereof in any way provided for, the acknowledged sum of $ 68,927.12, all of which had been paid for or collected in the manner hereinbefore stated for the purposes hereinbefore mentioned, and in direct compliance with the requirements of the act of Congress orginally providing for the construction of said canal; and that said money had been collected in good faith and for the purposes of devoting the same ultimately to the repair, improvement, supervision and expenses of the management thereof.

"And your orator further shows that there was purchased and collected from time to time a large quantity of tools, implements and property of various kinds in connection with extensions, repairs, improvements, management and control of said canal and lock by defendant, and at the time of the transfer to the United States as aforesaid the same were on hand and within the control and in the custody of the defendant, all of which properly belonged and appertained to the said canal and lock and to the defendant in its capacity as the manager and controller thereof, but whether any further and larger sum of money than is hereinbefore stated was, should or might have been on hand and within the control of said defendant, in its treasury or otherwise, or might or should have been accredited to the account of the said canal and lock, your orator does not know and has no means of being informed, and is therefore

obliged to depend upon an accounting by the defendant, hereinafter to be prayed for, for correct and authentic information.

## " *Fifth.*

" And your orator further shows that the State of Michigan had no beneficial interest in said canal or lock, except as it affected the general public welfare, and had expended, or claimed to have expended, all the appropriation of Congress for the construction of the same, and that the increasing demands of commerce required great expenditures of money for the enlargement and betterment of said canal and lock, together with the probable construction of a new and enlarged lock, and that it was not convenient, if possible, to provide the funds therefor by the collection of tolls upon the vessels passing and repassing through said canal; that the State of Michigan not alone being interested in such enlargement and improvement, but rather the general public, and particularly the inhabitants of several rapidly growing States of the Union, it was proposed to transfer the canal to the United States to accomplish such end, and for that purpose an act was passed by the legislature of the State of Michigan and became operative on March 3, 1881."

(This act, although not set forth in the bill, is given in the margin.)[1]

---

[1] Act No. 17, Public Acts 1881.

An act to authorize the board of control to transfer the Saint Mary's Falls Ship Canal, with the property belonging to the same, to the United States.

Whereas, Congress at its last session included in the river and harbor bill the following:

For improving and operating the Saint Mary's River and Saint Mary's Falls Canal, two hundred and fifty thousand dollars. "And the Secretary of War is hereby authorized to accept on behalf of the United States from the State of Michigan the Saint Mary's Canal and the public works thereon: *Provided,* Such transfer shall be so made as to leave the United States free from any and all debts, claims or liability of any character whatsoever, and said canal after such transfer shall be free for public use: *And provided further,* That after such transfer the Secretary of War be and hereby is authorized to draw from time to time his warrant on the Secretary of the Treasury to pay the actual expenses of operating and keeping said canal in repair;" therefore,

"By the terms of said act the board of control of said canal, constituted by defendant for its management, was authorized and empowered, at any time when they might deem it proper, to transfer all material belonging to said canal and to pay over to the United States all moneys remaining in the canal fund, excepting so much as might be necessary to put the canal in repair for its acceptance in accordance with the act transferring the same to the United States; and the Congress of the United States in turn passed an act authorizing the Secretary of War to accept on behalf of the United States from the State of Michigan the said canal and the public works thereon, and appropriating $250,000 to improve and operate the same, the same being the act approved June 14, 1880, found in 21 Stat. 189." (This act is correctly set forth in the preamble to the foregoing act of the State of Michigan.)

---

SEC. 1. *The People of the State of Michigan enact,* That the board of control of the Saint Mary's Falls Ship Canal be and hereby is authorized and directed to transfer the said canal and the public works thereon, with all its appurtenances and all the right and title of the State of Michigan in and to the same, to the United States, in accordance with (the) provisions of the above mentioned clause: *Provided,* That this cession is upon the express condition that the State of Michigan shall so far retain concurrent jurisdiction with the United States over the Saint Mary's Falls Ship Canal, and in and over all lands acquired or hereafter acquired for its use; that any civil or criminal process issued by any court of competent jurisdiction, or officers having authority of law to issue such process, and all orders made by such court, or any judicial officer duly empowered to make such orders, and necessary to be served upon any such person, may be executed upon said Saint Mary's Falls Ship Canal, its lands, and in the buildings that may be erected thereon, in the same way and manner as if jurisdiction had not been ceded as aforesaid.

SEC. 2. The board of control of the Saint Mary's Falls Ship Canal are hereby authorized and empowered, at any time when they may deem it proper, to transfer all material belonging to said canal, and to pay over to the United States all moneys remaining in the canal fund, excepting so much as may be necessary to put the said canal in repair for its acceptance in accordance with the act above recited: *Provided,* Such transfer of material and payment of moneys shall be in consideration of the construction, by the United States, of a suitable dry dock, to be operated in connection with the Saint Mary's Falls Ship Canal for the use of disabled vessels.

This act is ordered to take immediate effect.

Approved March 3, 1881.

" And thereupon said canal actually was transferred to the officers of the Government of the United States connected with the War Department thereof, and your orator shows, avers and charges that no tools, implements, personal property, chattels, goods, moneys or effects of any name or nature that were in the treasury of the State of Michigan, or should or might have been therein at the time of such transfer, or within the custody of said State of Michigan, defendant herein, or might have been in such custody connected with or belonging to said canal or lock, its funds, its management and control, were so transferred and turned over.

*" Sixth.*

" Your orator further shows that, while certain of the terms of the act of Congress appropriating the land for the construction of said lock and canal indicated a donation to the State of Michigan for such purpose, it was really the intent and purpose of the Congress of the United States to appropriate such lands, not for the purposes of exclusively enriching the State of Michigan, increasing its commerce or extending its authority alone, but for the purpose of accomplishing a public work for the general good of all classes of people engaged or interested in the commerce of the Great Lakes of the United States, and for that reason, while granting said lands to the State of Michigan in certain of its terms, it was provided that in case of the failure to construct said canal the proceeds of the sale of such lands should be returned to the United States; also that the State of Michigan should have no beneficial interest in the revenue from said canal, when constructed, while in its management and control, but that the said canal and lock should be actually free to the United States Government, and for the use of all persons desiring the same, except as to the necessary tolls to pay for their supervision, repairs and maintenance; and it was also provided that a strict account should be kept of the sales of said lands, and that they should be applied to the construction of said canal and lock and to no other purpose whatever; also that annual reports should be made by the State of Michigan and forwarded by the governor thereof to the Secre-

tary of the Interior concerning the management, control and sale of lands; and thus, instead of being an actual grant or donation of lands to the State of Michigan for its individual benefit, and to become a part of its domain and to be within its ownership, the terms of said act merely operated to create a trust in the State of Michigan for the purpose of carrying out a. public work in which it, the State of Michigan, had become interested for the general public good. Your orator further shows that by the act of the legislature of the State of Michigan hereinbefore quoted said donation or appropriation of lands was accepted subject to all limitations, restrictions and conditions imposed by Congress as aforesaid. Your orator further shows that the State of Michigan, at the time and continuously until a very recent period, hereinafter to be mentioned and set forth, not only regarded its sale of said lands, its construction of said works and its management and control of the latter as a trust for the public good from the complainant, but also through its legislature, as well as various of its officers, so declared; and that in an act of the legislature of the State of Michigan passed and approved February 14, 1859, the same being No. 175 of the session laws of the State of. Michigan for said year, and particularly in the third paragraph of the preamble thereof, said legislature made use of the following language:

" ' Whereas such canal, having been built and accepted by the authorities of this State, is found to need repairs in order to its preservation and usefulness, and the due performance of the trust created by said act of Congress, and the assent of this State thereto,' etc.

" And your orator further shows that the treasurer of the State of Michigan, who, by virtue of his office, was one of the members of the said board of control of the Saint Marys Falls Ship Canal, in his annual report for the year 1883, duly made to the governor and transmitted to the legislature of said State, made use of the following language :

" ' Since my last report, the remainder of the personal property belonging to the Saint Marys Falls Ship Canal has been sold, making a final balance in that fund of $68,927.12. All

business pertaining to the management of the canal on the part of the State has ceased and the moneys in the fund remain in the state treasury under act No. 17, laws 1881, the State acting simply as trustee.'

" But your orator shows that of late said defendant, through its officers and servants, and particularly its attorney general and the board of control of St. Marys Falls Ship Canal, denies such a trust, or its liability to the United States in the premises.

## *" Seventh.*

" Your orator further shows and charges that it became and was the duty of the State of Michigan to transfer and pay over to the United States all funds appertaining to or connected with or collected for the repairs and management of said ʟcanal to the complainant, and to transfer to the complainant all property of every name and nature within its custody and control in connection with said canal and lock, and that instead of so performing its equitable duty in the premises, the said State of Michigan, the defendant herein, converted said funds to its own use, by passing a joint resolution transferring the same from the canal fund to the general fund in the treasury of said State, said joint resolution being No. 20, of the public acts of 1897, which in terms is as follows:

" ' Whereas there has remained to the credit of the St. Marys Ship Canal fund a credit balance which was on hand at the time of the transfer of the said canal from the State to the United States, and no claim has been made for any part of such moneys, either by any person who paid the same into the fund or by the General Government;

" ' And whereas there now remains on hand, under the board of control of the St. Marys Ship Canal, an invoice of tools and machinery, and no demand by any person or persons or by the United States having been made for a transfer of said tools and machinery:

" ' *Therefore, resolved by the Senate and House of Representatives of the State of Michigan,* That the auditor general be, and he is hereby, directed to transfer such balance as shown upon

the books of his office to the same, and it shall hereafter be-
come a part of the general fund of the State.

"'*And be it further resolved,* That the board of control of
the St. Marys Ship Canal be, and they are hereby, authorized
to dispose of, at the best possible advantage, the tools and
machinery aforesaid and now under their control, and deposit
the money received from the sale of said property in the gen-
eral fund of this State.'

"Your orator further shows that a due and proper request
to account to the United States in the premises, and to pay over
all funds and turn over all property in its hands to the United
States, has been made by your orator of the governor of the
State of Michigan and all of the officers of said State directly
concerned in any manner with the custody, management or
control of said fund or property, and particularly of the board
of control of the St. Marys Ship Canal, which consists of the
governor, auditor general and treasurer of the said State of
Michigan; and also of the attorney general of the State of
Michigan, and that said reasonable and just request has been
refused by them and each of them."

The bill prayed for an accounting as to the sales of the lands,
the prices obtained therefor, the application of the proceeds of
the sales or exchange of such lands to the cost of the construc-
tion of the canal, the tolls received, their application, and also
an accounting as to the tools on hand at the time of the trans-
fer of the canal to the United States.

*Mr. Horace M. Oren,* attorney general of the State of Michi-
gan, for defendant.

There was no trust relation between the United States and
the State of Michigan, but the State, by the act of 1852, took
an absolute, unconditional and indefeasible title upon its ac-
ceptance of the grant and the completion of the canal, and by
right of such ownership belongs to it any incidental pecuniary
benefits or earnings that may have arisen from its operation of
the canal.

*First :* The words of grant found in the act are such as are

commonly employed to vest a fee title and a beneficial interest in the grantee.

*Second:* The limitations upon the use of the canal imposed by the act in question cannot be considered as conditions subsequent intended to operate in possible impairment of an otherwise indefeasible title, but as covenants of the grantee enforceable only through actions in that behalf and not by forfeiture or defeasance of the estate granted.

*Third:* The acts of both the United States and the State as expressed in legislation negative the idea that the State's title to the canal was not absolute and indefeasible, and that the United States had an usufructory interest in the tolls or other earnings thereof.

Admitting the allegations in complainant's bill, it does not appear that the conditions relative to the use and operation of the canal imposed by the act of August 26, 1852, were violated by the State. No breach of the conditions upon which a money demand could be predicated is claimed in complainant's bill except that the State made a profit out of the operation of the canal. A surplus of tolls was on hand to meet possible emergencies, but this is not to be held as a violation of the limitation upon the amount of tolls that could be collected. A certain portion of the earnings of the canal was not subject to the conditions which related to the rates of toll that could be charged. The United States, by subsequently taking over and accepting the canal from the State, particularly in the light of the several acts of offer and acceptance, must be held to have waived any claims for a breach of the condition imposed by the original grant.

Conceding *arguendo*, that upon acceptance of the grant the State became a mere trustee and not seized of an estate implying the vesting of a beneficial interest in the grantee, the United States was not named or intended as *cestui que trust.*

But whether *cestui que trust,* or having any interest in the execution of the trust that would entitle it to apply to a court of chancery to compel its proper enforcement, the United States acknowledged the due execution of the trust and discharged the trustee by its taking over of the canal and by the

declarations contained in the act of Congress in reference thereto.

The declarations of the legislature and officers of the State of Michigan did not create a trust, and certainly not one in which the United States would have a beneficial interest as *cestui que trust.*

If Congress, on the termination of the so-called governmental agency or mixed trust and power, could have made a claim of right to have the surplus tolls accumulated by the State in carrying out such agency turned over to itself, yet nothing short of a declaratory act to that effect would create the right on the part of the Department of Justice to make this demand upon the State.

The acts of Congress and the acts of the legislature of Michigan relating to the taking over of the canal by the United States operated as a settlement of all accounts between the United States and the State, rendering an accounting unnecessary.

*Mr. Marsden C. Burch* for the United States.

Laches have been set up as a ground of demurrer, but as no consideration has been given to that ground in the brief or in oral argument, that question might well be considered eliminated. The only remaining question is whether the State constructed the canal and operated it upon a trust for the United States. It was a mixed trust and power. The original granting act had a two-fold purpose. First, the granting of an easement or right of way through the public domain for the purpose of constructing the canal. Second, the appropriation of lands and the disposal of the same, the construction of the canal and its operation and maintenance. While it is true the term " granted " was used in the act, it will be observed that the property granted was " for the aforesaid purposes and no other." These words of express limitation serve to show that it was not the intention of the Government to invest the State with unqualified ownership in the canal, but simply with the management and control of the same. The word " grant " is not a technical word like " enfeoff," and the State took but a naked

trust in the thing granted. *Rice* v. *Railroad Company*, 1 Black, 378, construing an act of Congress granting lands to a Territory for the purpose of aiding in the construction of a railroad.

The intention of Congress that the whole enterprise was merely a trust is evident from the fact that due care was taken to provide in the act for an annual accounting and reports by the State to the Secretary of the Interior. These reports and accounts have never been rendered, and thus it becomes necessary to invoke this court in aid thereof. The Government is entitled to an accounting for all the lands sold, the prices received for them, the amount of tolls earned and collected, and the amount of money expended on behalf of the canal. It is also entitled to any moneys on hand at the time the canal was turned over, as well as all tools, implements, machinery, etc., or their equivalent in money.

The act of the legislature of Michigan accepting the grant subject to all the conditions expressed in the act of Congress completed the trust relation. Subsequently, the State, in passing other legislation regarded it as a trust and so characterized it from time to time. The report of the state treasurer also regarded it in this light in reporting the amount of money on hand in the canal fund after the canal had been turned back to the United States.

The money had never been paid over by the State. By a joint resolution of its legislature, the amount was converted to the use of the State and covered into its general fund.

The State took the lands for the purpose of constructing the canal upon certain conditions and limitations, obligating itself to render accounts and reports of all its doings in the premises. The acts of Congress and the acts of the legislature taken together clearly indicate that a trust was created and the United States now seeks an accounting by the trustee.

The bill is well founded in law and the demurrer should be overruled.

MR. JUSTICE PECKHAM, after making the foregoing statement of facts, delivered the opinion of the court.

By its bill the United States invokes the original jurisdiction of this court for the purpose of determining a controversy existing between it and the State of Michigan. This court has jurisdiction of such a controversy, although it is not literally between two States, the United States being a party on the one side and a State on the other. This was decided in *United States* v. *Texas*, 143 U. S. 621, 642.

In the consideration of this case, the controlling thought must of course be to arrive at the meaning of the parties, as expressed in the various statutes set forth in the bill. While that meaning is to be sought from the language used, yet its construction need not be of a narrow or technical nature, but in view of the character of the subject, the language should have its ordinary and usual meaning.

Whether, under these circumstances, technical words were used to express the thought that the State was to be a trustee, is not important if, upon a reading of the statutes and a survey of the condition of the country when the acts were passed, it is apparent that the intent was that the State should occupy the position of trustee in the construction and operation of the canal. *Winona &c. R. R. Co.* v. *Barney*, 113 U. S. 618, 625.

The general purpose of these statutes was to build a ship canal, by means of the funds procured from the sale or other disposition of the public lands of the United States, to be used by all those whose business or pleasure should call them to pass through it in order to reach their destination.

As is well known, the Saint Marys River connects the waters of the lakes, Huron and Superior. The navigation of the river is interrupted by Saint Marys Falls, and it early became necessary, in order to provide conveniences for a rapidly increasing commerce, that there should be built a ship canal around these falls, so that large vessels coming from or going to Lake Superior should be thereby enabled to pursue their voyage to the east or to the west without interruption by those falls. The State of Michigan did not feel at that time (1850–1852) able to undertake such work herself, although it was a matter of much importance to many of her citizens. Finally the United States passed the act of 1852, set out in full in the foregoing state-

ment. The State subsequently accepted the same with all the conditions contained therein. We think it sufficiently appears from a perusal of these two acts that it was assumed that the grant of the right of way through the lands of the United States and the grant of the 750,000 acres of its public lands in the State of Michigan would pay the cost of construction of the canal, and the tolls to be collected by the State would repay it for all advances made by it in the repairs which would naturally and from time to time be required in such a work. There was no reason why the United States should provide that the State of Michigan should actually receive a profit over and above the payment to it of all its expenses for the construction of the canal and for keeping it in repair. If, through the action of the United States, a public work of national importance were constructed within the boundaries of that State, and the State itself reimbursed for every item expended by it in the construction and in the keeping of such work in repair, it would certainly seem as if the State could properly ask no more. It was clearly not the intention that the State should realize a beneficial interest from the transaction between the United States and the State over and beyond that which would arise from the existence of this canal. The cost of its construction and the keeping of it in repair were not to be borne by the State, even to the extent of a single dollar. That the parties supposed the cost would be borne by the United States is proved by an examination of the statutes, and if it be a fact, it goes far to show that the State was in this matter acting in effect and substance as an agent, or, in other words, as a trustee for the United States, and that the transaction was not to be a source of profit to the State, by reason of getting more from the United States than it would cost to build the canal.

The expectation that the means provided by the United States for the construction of the work would be adequate for that purpose, was not a visionary one, and it is proved by the fact, alleged in the bill and admitted by the demurrer, that such means were in truth adequate, and the canal was wholly constructed from the appropriation of the lands granted by the United States, and managed, repaired and maintained from

the tolls exacted by the State from vessels passing through the canal.

An examination of the act of Congress of 1852, set forth in the foregoing statement of facts, will show, as we think, the trust character of the transaction between the United States and the State. There is granted to the State, by section one, the right of locating a canal through the public lands of the United States four hundred feet in width, but this right of way is by the terms of the act to be used by the State or under its authority for the construction or convenience of such canal and the appurtenances thereto, and the use thereof is thereby vested in the State forever, but "for the purposes aforesaid and no other." The canal must be at least one hundred feet wide, with a depth of water of twelve feet, and with locks at least two hundred and fifty feet long and sixty feet wide. The act does not grant an absolute estate in fee simple in the land covered by this right of way. It was in effect a grant upon condition for a special purpose; that is, in trust for use for the purposes of a canal, and for no other. The State had no power to alien it and none to put it to any other use or purpose. Such a grant creates a trust at least by implication. We have just held in *Northern Pacific Company* v. *Townsend, ante* p. 267, in reference to a grant of a right of way for the railroad, that it was "in effect a grant of a limited fee, made on an implied condition of reverter in the event that the company ceased to use or retain the land for the purpose for which it was granted."

The second section granted to the State, "for the purpose of aiding said State in constructing and completing said canal, 750,000 acres of public lands," belonging to the United States and lying within the State, which were to be subject to the disposal of the legislature of the State for such purpose and no other, and the canal was to be and remain a public highway for the use of the Government of the United States, free from toll or other charge upon the vessels of said Government engaged in public service, or upon vessels employed by said Government in the transportation of any property or troops of the United States. It was also provided that if the canal should not be commenced within three years and completed within ten years, the State

was bound to pay to the United States the amount it received upon the sale of any part of said lands by the State at not less than $1.25 per acre, although the title to the purchasers from the State should remain valid. The State was bound to cause to be kept accurate accounts of sales and net proceeds of the lands granted and of all expenditures in the construction, repair and operating of the canal and of the earnings thereof, and was to render a statement of the same annually to the Secretary of the Interior, and whenever the State should be fully reimbursed for all advances made for the construction, repairs and operation of the canal, with legal interest on all advances until the reimbursement of the same, or upon payment by the United States of any balance of such advances from the receipts from the lands and canal with such interest, the State was then only to be allowed to tax for the use of the canal such tolls as should be sufficient to pay all necessary expenses for the care, charge and repairs of the same, and before the State could dispose of any of the lands, the route of the canal was to be established and a plat thereof filed in the office of the War Department, and a duplicate thereof in the office of the Commissioner of the General Land Office. The sixth paragraph of the bill calls special attention to these facts.

In this Federal statute we find the purpose of the United States in granting the land. It was not for the benefit of the State of Michigan, and the State did not thereby receive any beneficial interest in such lands. As soon as it was repaid its outlay for the cost of the construction and for the maintenance and repairs of the canal, the tolls were to be reduced to such a sum as should be sufficient only to pay the necessary expenses for the care, charge and repair of the same. Evidently it was not supposed that the State was to profit from this grant further than such profit as might arise indirectly from the completion and operation of the canal.

Defendant refers to certain grants of land made to Illinois, Indiana and Ohio, and perhaps to some of the other States, where such grants were made to aid in the construction of canals in those States, and where possible profits from the construction of such canals were within the contemplation of the various grants.

But in the acts referred to there are no restrictions upon the tolls which the States may charge for the use of their respective canals, the only limitation imposed being that the Government should have their free use for the passing of its vessels, while in this act the tolls which the State may charge are to be only such, after the payment for its construction, etc., as should be sufficient to pay the necessary expenses for the care, charge and repairs thereof.

The State of Michigan, through an act of its legislature, duly accepted the terms of the act of Congress, and agreed to carry out all the conditions therein made obligatory upon that State. An attentive reading of that statute shows its purpose to conform to all of the provisions of the Federal statute. It provides (section 7) for keeping accurate books of account of sales and net proceeds of the lands and for making returns to the Secretary of the Interior containing such accounts; provides (section 5) for designating the lands granted as " Saint Mary Canal Lands;" and also (section 3) provides that in letting contracts for construction of the canal, the responsibility of the proposed contractor and his ability to carry into effect the object of the act of Congress are to be considered. Reading both statutes, it seems to us the effect was to create a trust, and that the State was made the trustee to carry out the purposes of the act of Congress in the construction and maintenance of the canal. If there were funds arising from the sale of the lands over and above the cost of construction and other expenses of the canal, it could not within reason (after a perusal of these two statutes, with the provisions for accounting for sales and net proceeds of lands, and the other provisions of the statutes already mentioned) be supposed the parties understood that Michigan was to have for its own treasury the balance arising beyond such cost, maintenance, etc., of the canal. If a surplus arose in the course of the operation of the canal the tolls were to be at once reduced, and it seems to us that that surplus would upon a fair and reasonable construction of the acts belong to the original owner of the lands, by means of which the State, as in substance the agent of the United States, was enabled to construct the canal and secure the tolls arising from its operation, to be expended upon its maintenance

and for necessary repairs.   This would certainly be so after the formal transfer of the canal and after the surplus was conclusively ascertained, and was subject to no further claims for repairs of the canal on the part of the State.   The tolls were in fact the proceeds of the trust fund (the lands) which belonged to the United States, and should be tranferred with the rest of the trust property.

Where Congress grants land to a State to be used as provided in this statute, we think a trust or power to dispose of the lands for the purpose of carrying out the improvement is granted, and in this case no beneficial interest passes to the State by the language used, considering the whole statute. *Rice* v. *Railroad Company,* 1 Black, 358, 378.

If any particular part of the statute in this case were ambiguous or its meaning doubtful, of course the intention must be deduced from the whole statute and every part of it.   Hence the importance of those provisions which in effect, if carried out, prevent the State from making any direct profit by the construction of the canal or from the tolls received from vessels passing through it.   And where words are ambiguous, legislative grants must be interpreted most strongly against the grantee and for the Government, and are not to be extended by implication in favor of the grantee beyond the natural and obvious meaning of the words employed.   Any ambiguity must operate against the grantee and in favor of the public.   *Rice* v. *Railroad Company, supra,* p. 380.   This rule of construction obtains in grants from the United States to States or corporations in aid of the construction of public works.   1 Black, 381.

Then, too, there is the almost contemporaneous construction placed upon the Federal statute by the legislature of Michigan in the act No. 175, approved February 14, 1859, in the preamble of which it is said that " whereas such canal, having been built and accepted by the authorities of this State, is found to need repairs in order to its preservation and usefulness, and the due performance of the trust created by said act of Congress and the assent of this State thereto," etc.   Again, the treasurer of the State, who by virtue of his office was one of the members of the board of control of the Saint Marys Falls Ship

Canal, in the course of his annual report for the year 1883, made to the governor and transmitted to the legislature of the State, used the following language:

"Since my last report, the remainder of the personal property belonging to the Saint Marys Falls Ship Canal has been sold, making a final balance in that fund of $68,927.12. All business pertaining to the management of the canal on the part of the State has ceased and the moneys in the fund remain in the state treasury under act No. 17, laws of 1881, the State acting simply as trustee."

We do not, of course, assume that the state treasurer could bind the State of Michigan by any admission he might make in a report to the legislature of that State, but it shows simply the understanding of that official, who was so closely connected with the construction and operation of the canal, in relation to the surplus funds in the treasury of the State arising out of the operation of the canal. That the state legislature in 1859 regarded the State as a trustee, is evident from the above language in the portion of the preamble quoted.

Finally, by the joint resolution of the legislature, being No. 20 of the Public Acts of 1897, it was stated as follows:

"Whereas, there has remained to the credit of the Saint Mary's Ship Canal fund a credit balance which was on hand at the time of the transfer of the said canal from the State to the United States, and no claim has been made for any part of such moneys, either by any persons who paid the same into said fund or by the General Government,

"And whereas, there now remains on hand, under the control of the board of control of the Saint Mary's Ship Canal, an invoice of tools and machinery, and no demand by any person or persons or by the United States having been made for a transfer of said tools and machinery; therefore

"*Resolved by the Senate and House of Representatives of the State of Michigan,* That the auditor general be and he is hereby directed to transfer such balance as shown upon the books of his office to and the same shall hereafter become a part of the general fund of the State.

"*And be it further resolved,* That the board of control of the

Saint Mary's Ship Canal be and they are hereby authorized to dispose of, at the best possible advantage, the tools and machinery aforesaid and now under their control, and deposit the money received from the sale of said property in the general fund of this State."

From these statutes and resolutions we think it quite clearly appears that the State and its public officers thought that a trust had been created, and that the State had received the lands in trust for the purpose of carrying out the provisions of the Federal statute. A surplus arising from the sales of lands and from the tolls, over and above all cost of construction, repairs, etc., after the formal transfer of the canal itself, belongs to the United States, and it is the proper party to recover the same.

The counsel for defendant, however, urged that other action by the United States shows that no such trust existed. He referred to the joint resolution of the State adopted in 1869, wherein the necessity for the immediate enlargement of the Saint Marys Falls Canal, a work of urgent necessity and national importance, was advocated, and it was therein said that the State of Michigan had no funds properly applicable to such purpose; and it was, therefore, resolved that the board of control of the canal should be authorized and directed to transfer the canal, with all its appurtenances and all the right and title of the State of Michigan in and to the same, to the United States, provided the State should be first guaranteed and secured to the satisfaction of the board against loss, by reason of its liability, on certain bonds which had been issued by it under authority of an act to provide for the repairs upon the canal, " and to perform the trust respecting the same," approved February 14, 1859. Even in this act of 1859, the legislature, as has already been stated, acknowledges the trust and passes an act for the purpose of performing its obligations respecting the same. But it is said that this resolution (of 1869) providing for the transfer of the canal was not noticed or accepted by the United States until 1880, when Congress, by an act approved June 14, 1880, authorized the Secretary of War to accept on behalf of the United States from the State of Michigan the

canal, provided "such transfer should be made so as to leave
the United States free from any and all debts, claims and lia-
bility of any character whatever.    Said canal after such trans-
fer to be free for public use."

This offer under the act of 1880 was accepted by the State by
act No 17, Public Acts of Michigan of 1881, *supra*, and the board
of control was authorized and directed : First. ".To transfer
the said canal and the public works thereon, with all its appurte-
nances and all the right and title of the State of Michigan in and
to the same, to the United States," in accordance with the pro-
visions of the act of Congress approved June 14, 1880 ; and, sec-
ond, "At any time when they may deem it proper, *to transfer
all material belonging to said canal, and to pay over to the United
States all moneys remaining in the canal fund*, excepting so
much as may be necessary to put the said canal in repair for its
acceptance in accordance with the act above recited : *Provided,
Such transfer of material and payment of moneys* shall be in
consideration of the construction, by the United States, of a suita-
ble dry dock, to be operated in connection with the Saint Mary's
Falls Ship Canal for the use of disabled vessels."

It is argued from this legislation that Congress thereby rec-
ognized and acknowledged the ownership of the canal by the
State free from any trust connected therewith, and that the pro-
vision by the State for transferring all material belonging to
the canal and for paying over to the United States all moneys
remaining in the canal fund, etc., were upon the condition just
quoted, and it is stated that there was no proof that such dry
dock had been constructed, and hence there was no liability on
the part of the State to pay the moneys or deliver the tools.
But if the original transaction amounted to a trust, as we think
it did, the attempt of the State to impose a condition upon its
payment of the moneys and the transfer of the tools did not
take away its liability as trustee nor make it necessary that the
United States should build the dry dock before it should be en-
titled to the money and the tools.    The United States might
have been satisfied to permit the State to retain its nominal title
and to remain in possession, and to operate the canal under its
original obligations, and when in 1880 it authorized the Secretary

of War to accept the canal from the State without any liability on its part for debts or claims in regard to the canal, it did not thereby in any manner admit the non-existence of any trust there-t fore created. Assuming that the land grant and the tolls had b₁ ₃n sufficient to construct the canal and operate and repair it, there was no reason why the United States should assume or agree to pay any debts or claims which might exist in regard to the canal. The consideration for the transfer of the material and the payment of the moneys amounted at most to a provision in the nature somewhat of a condition subsequent, and the right to such transfer and payment did not rest upon the prior building of the dry dock by the United States. There was nothing in this legislation, in our opinion, which changed the character in which the State had acted as trustee up to the time of such transfer of the canal, and the liability of the State was not altered by reason of the act of 1880 or that of 1881.

We are of opinion that the bill shows a cause of action against the State of Michigan as trustee, and its liability to pay over the surplus moneys, (if any,) which upon an accounting it may appear have arisen from the sale of the granted lands, over and above all cost of the construction of the canal and the necessary work appertaining thereto, and the supervision thereof, to-gether with the surplus money arising from the tolls collected, which latter sum by the demurrer is admitted to amount to $68,927.12. This sum the United States in substance (especially in the fourth paragraph of the bill) admits is all that is due from the State on account of such tolls. It is not entitled to go back of that amount and call for an accounting as to the tolls prior to the transfer of the canal to the United States. The latter is also entitled to recover the value of the tools, etc., mentioned in the bill, as of the time of the transfer of the canal.

We think there is no ground of defence arising from any alleged laches on the part of the United States in bringing this suit. Assuming the existence of what would be laches in a private person, the defence that might arise therefrom is not available ordinarily against the Government. *United States* v. *Beebe,* 180 U. S. 343, 353.

There must be judgment overruling the demurrer, but as the defendant may desire to set up facts which it might claim would be a defence to the complainant's bill, we grant leave to the defendant to answer up to the first day of the next term of this court. In case it refuses to plead further, the judgment will be in favor of the United States for an accounting and for the payment of the sum found due thereon.

*Demurrer overruled and leave to answer given, etc.*