**Warren BERES and Vicki Beres, Husband and Wife, Plaintiffs,**

v.

**UNITED STATES, Defendant.**

**No. 03–785L.**

United States Court of Federal Claims.

March 16, 2005.

John M. Groen, Groen, Stephens & Klinge, LLP, Bellevue, WA, for the plaintiffs.

David W. Spohr, Trial Attorney, General Litigation Section, Environment and Natural Resources Division, United States Department of Justice, Seattle, WA, for the Defendant.

Andrea Ferster, General Counsel, Charles H. Montagne, Attorney, Rails to Trails Conservancy, Seattle, WA, amicus curiae.

## OPINION

HORN, Judge.

The plaintiffs in this case allege that the United States has taken their property by claiming a reversionary interest in a railroad right-of-way that traverses over their property and denying plaintiffs the use of their property. Specifically, in their complaint, the plaintiffs allege that by issuing a Notice of Interim Trail Use (NITU), and converting the railroad right-of-way to a trail, the United States imposed an additional burden on their property, denying them their property interest in the right-of-way, resulting in a taking of their property. Therefore, plaintiffs are seeking just compensation under the Fifth Amendment to the United States Constitution.

## FINDINGS OF FACT

For the purposes of the motion for summary judgment filed by the defendant, the material facts of the case are not in dispute. The plaintiffs, Warren and Vicki Beres, are fee simple owners of a residential property on the eastern shore of Lake Sammamish, in King County, Washington. When the plaintiffs purchased their property, their title was encumbered by a railroad right-of-way through their property. The right-of-way was granted to the Seattle, Lake Shore, and

Eastern Railroad Company (the Seattle Railroad Company)[1] under the General Railroad Right of Way Act of 1875, 18 Stat. 482, 43 U.S.C. §§ 934 *et seq.* (repealed 1976) (the 1875 Act).[2] The 1875 Act granted railroad companies rights-of-way over public land to construct tracks and operate railways. The requirements for obtaining a right-of-way were set forth in the 1875 Act, and included filing a map of the intended railroad with the local district land office and receiving approval from the Secretary of the Interior. *See* General Railroad Right of Way Act of 1875, § 4 (codified at 43 U.S.C. § 937).

Pursuant to the 1875 Act, between 1887 and 1891, the Seattle Railroad Company took the necessary steps to establish a railroad right-of-way across public land along the eastern shore of Lake Sammamishin King County, Washington. On July 5, 1887, the Seattle Railroad Company secured approval from the Department of the Interior of their map identifying the location for proposed construction of a railroad running generally along the eastern shoreline of Lake Sammamish, Washington. Construction of the railroad was completed in 1888. On April 15, 1891, the Seattle Railroad Company filed, with the United States Land Office in Seattle, Washington, a Map of Location showing the final location of the constructed railroad. A segment of the completed railroad traversed through a parcel of land identified as Government Lot 4, Section 6, Township 24 North, Range 6 East, Willamette Meridian, in King County, Washington.

On January 11, 1892, after the Seattle Railroad Company had secured its right-of-way under the 1875 Act, the United States issued a land patent to William H. Cowie. The parcel of land patented to William H. Cowie was described as Government Lot 4, in Section 6, Township 24 North, Range 6 East, Willamette Meridian, in what is now King County, Washington. Thus, the parcel

of land patented to William H. Cowie included a portion of the right-of-way previously secured by the Seattle Railroad Company.

The complete chain of title from William H. Cowie to the plaintiffs was not presented to the court for the purposes of this motion for summary judgment, and the United States reserves the right to raise challenges to the chain of title from Mr. Cowie to Mr. and Mrs. Beres. Nonetheless, for the purposes of this motion for summary judgment, the plaintiffs are considered by both parties and the court to be successors in interest to a portion of the Government Lot 4 land patented to William H. Cowie, over which the Seattle Railroad Company's right-of-way traversed. Thus, the transfer of land occurred as follows—the federal government granted the Seattle Railroad Company a right-of-way over federal land pursuant to the 1875 Act. The United States then patented to William H. Cowie a portion of land over which the right-of-way traversed. The plaintiffs are presumed successors in interest to William H. Cowie's land, and took their property subject to the railroad's right-of-way. The plaintiffs' property interests derive from the 1892 land patent given to William H. Cowie by the United States.

In 1997, Burlington Northern, a successor in interest to the Seattle Railroad Company's right-of-way, concluded that continued operation of the pertinent line was not economically viable. *See Redmond–Issaquah R.R. Pres. Ass'n v. Surface Transp. Bd.,* 223 F.3d 1057, 1058 (9th Cir.2000). Therefore, in 1998, Burlington Northern sought an exemption from the United States Department of Transportation, Surface Transportation Board (STB) to abandon a 12.45 mile line of railroad on the eastern shore of Lake Sammamish, a portion of which traverses the plaintiffs' property. *See Burlington Northern & Santa Fe Ry. Co.—Abandonment Exemption—in King County, WA,* STB Docket

---

1. The United States originally granted the railway right-of-way to the Seattle Railroad Company. The Seattle Railroad Company was later acquired by the Northern Pacific Railway Company, which in turn became part of Burlington Northern and Santa Fe Railway Company (Burlington Northern). The parties do not dispute that Burlington Northern was a successor in interest to the right-of-way granted to the Seattle Railroad Company under the 1875 Act.

2. The General Railroad Right of Way Act of 1875 was repealed by the Federal Land Policy and Management Act of 1976, Pub.L. No. 94–579, § 706(a), 90 Stat. 2743, 2793 (1976).

No. AB–6 (Sub. No. 380X), 1998 WL 638432 (S.T.B. Sept. 16, 1998).

On May 13, 1998, the STB granted Burlington Northern an exemption to abandon a 12.45 mile length of railroad between milepost 7.3, near Redmond, and milepost 19.75, at Issaquah, in King County, Washington. *See id.* On September 16, 1998, the STB authorized The Land Conservancy (TLC) of Seattle and King County to assume financial responsibility for the right-of-way pursuant to the National Trails System Act Amendments of 1983 § 208, Pub.L. No. 98–11, 97 Stat. 42, 16 U.S.C. § 1247(d) (1994). *See id.* The STB also authorized the issuance of a NITU for the Burlington Northern right-of-way, permitting King County and TLC to establish a trail over the railroad right-of-way. The STB's ruling authorized the conversion of the railroad right-of-way into a recreational trail pursuant to 16 U.S.C. § 1247(d). King County, Washington subsequently reached an agreement with Burlington Northern for use of the right-of-way for trail purposes. Since the STB approved conversion of the railway to a trail, no railway carriers have used the railroad, and the tracks subsequently were removed from the right-of-way.

## DISCUSSION

The defendant filed a motion for summary judgment pursuant to Rule 56 of the Rules of the United States Court of Federal Claims (RCFC).[3] RCFC 56 is patterned on Rule 56 of the Federal Rules of Civil Procedure (Fed. R.Civ.P.) and is similar both in language and effect. Both rules provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c); Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Monon Corp. v. Stoughton Trailers, Inc.,* 239 F.3d 1253, 1257 (Fed. Cir.2001); *Avenal v. United States,* 100 F.3d 933, 936 (Fed.Cir.1996), *reh'g denied* (1997); *Creppel v. United States,* 41 F.3d 627, 630–31 (Fed.Cir.1994). A fact is material if it will make a difference in the result of a case under the governing law. Irrelevant or unnecessary factual disputes do not preclude the entry of summary judgment. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 247–48, 106 S.Ct. 2505; *see also Monon Corp. v. Stoughton Trailers, Inc.,* 239 F.3d at 1257; *Curtis v. United States,* 144 Ct.Cl. 194, 199, 168 F.Supp. 213, 216 (1958), *cert. denied,* 361 U.S. 843, 80 S.Ct. 94, 4 L.Ed.2d 81 (1959), *reh'g denied,* 361 U.S. 941, 80 S.Ct. 375, 4 L.Ed.2d 361 (1960). Both parties and the court agree that, for the purposes of resolving the defendant's motion for summary judgment, the material facts of this case are not in dispute, and, therefore, this issue may be resolved through a summary judgment motion.

In its motion for summary judgment, the defendant argues that when the United States granted the Seattle Railroad Company a right-of-way under the 1875 Act, the United States retained a reversionary interest in the land underlying the right-of-way, such that when Burlington Northern stopped using the right-of-way for railroad purposes, the reversionary interest entitled the United States to permit the railway right-of-way to

---

**3.** The court permitted the Rails to Trails Conservancy (RTC) to file a brief as amicus on behalf of the defendant. According to RTC, it is a nonprofit corporation formed in 1985 with more than 100,000 members nationwide, including nearly 3,000 members in the state of Washington, dedicated to assisting state and local governments and other organizations to preserve otherwise to be abandoned railroad corridors for continued public use. RTC is interested in the legal construction of federal statutes applicable to federally-granted railroad rights-of-way. RTC promotes the public's continued and substantial investment in these transportation corridors to foster and preserve them for continued public transportation uses. RTC has purchased, or contracted to purchase, a number of railroad lines containing federally-granted railroad rights-of-way for trail and related preservation purposes, and, therefore, claims a direct economic stake in certain federally-granted railroad right-of-way properties. RTC argues that Congress has provided for such continual use in statutes governing the use and disposition of federally-granted railroad rights-of-way.

be converted into a trail. Moreover, according to the defendant, the plaintiff's predecessor in interest, William H. Cowie, was given a patent to Lot 4 subject to the railroad's right-of-way and the United States' reversionary interest in the United States.

The plaintiffs, however, respond that when the Seattle Railroad Company was issued a right-of-way under the 1875 Act, it was granted only an easement, such that when Burlington Northern stopped using the right-of-way for railroad purposes the easement was lifted from the property and no property interest reverted to the United States. The plaintiffs argue that by issuing the NITU, the United States imposed an additional burden on their property, denying them their property interest in the right-of-way and causing a taking of their property without just compensation, in violation of the Fifth Amendment to the United States Constitution.

Initially, the court must decide whether the plaintiffs possess any interest in the land through which the right-of-way was granted, and if so, the nature of that interest. This is the only issue briefed in defendant's motion for summary judgment motion. If the plaintiffs have an interest, they may proceed with a claim that the interest was taken and that compensation is due when the STB issued the NITU and converted the railway to a trail. If, however, the United States retained a reversionary interest in the land through which the right-of-way was granted, plaintiffs have no property right on which to base a takings claim. Stated otherwise, the sole issue presented in defendant's motion for summary judgment is whether the United States, when it granted a right-of-way to the Seattle Railroad Company under the 1875 Act, and subsequently patented the underlying land to William H. Cowie in 1892, retained a reversionary interest, such that when the right-of-way was no longer used for railroad purposes, the right-of-way reverted to the United States, and not to the plaintiffs as the adjacent landowners.

The plaintiffs argue that the United States has taken their property without just compensation, in violation of the Fifth Amendment to the United States Constitution. The Takings Clause of the Fifth Amendment to the United States Constitution provides in pertinent part: "nor shall private property be taken for public use without just compensation." U.S. Const. amend. V. The purpose of this Fifth Amendment provision is to prevent the government from " 'forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.' " *Palazzolo v. Rhode Island,* 533 U.S. 606, 618, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001) (quoting *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960)); *see also Eastern Enters. v. Apfel,* 524 U.S. 498, 522, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998); *Janowsky v. United States,* 133 F.3d 888, 892 (Fed.Cir. 1998); *Florida Rock Indus., Inc. v. United States,* 45 Fed. Cl. 21, 24 (1999). There is a "clear principle of natural equity that the individual whose property is thus sacrificed [for the public good] must be indemnified." *Pumpelly v. Green Bay & Mississippi Canal Co.,* 80 U.S. (13 Wall.) 166, 179, 20 L.Ed. 557 (1871).

Under the Tucker Act, the Court of Federal Claims has exclusive jurisdiction to render judgment upon any claim against the United States for money damages exceeding $10,000.00 that is "founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or · upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1) (2000). Therefore, "a claim for just compensation under the Takings Clause must be brought to the Court of Federal Claims in the first instance, unless Congress has withdrawn the Tucker Act grant of jurisdiction in the relevant statute." *Eastern Enters. v. Apfel,* 524 U.S. at 520, 118 S.Ct. 2131 (citing *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1016–19, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984)); *see also Morris v. United States,* 392 F.3d 1372, 1375 (Fed.Cir.2004) ("Absent an express statutory grant of jurisdiction to the contrary, the Tucker Act provides the Court of Federal Claims exclusive jurisdiction over takings claims for amounts greater than $10,000."). The United States Supreme Court has de-

clared: "If there is a taking, the claim is 'founded upon the Constitution' and within the jurisdiction of the [United States Court of Federal Claims] to hear and determine." *Preseault v. Interstate Commerce Comm'n,* 494 U.S. 1, 12, 110 S.Ct. 914, 108 L.Ed.2d 1 (1990) (quoting *United States v. Causby,* 328 U.S. 256, 267, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946)); *see also Narramore v. United States,* 960 F.2d 1048, 1052 (Fed.Cir.1992); *Perry v. United States,* 28 Fed.Cl. 82, 84 (1993).

To succeed under the Takings Clause to the Fifth Amendment, the plaintiffs must show that the government took their private property for public use without just compensation. *See Adams v. United States,* 391 F.3d 1212, 1218 (Fed.Cir.2004). A takings claim requires a two-step analysis in which a court first determines whether a plaintiff possesses a cognizable property interest in the subject of the alleged taking. Then, if the plaintiff does possess a property interest, the court decides if the governmental action at issue constituted a taking of that property. *See id.; Boise Cascade Corp. v. United States,* 296 F.3d 1339, 1343 (Fed.Cir.), *reh'g and reh'g en banc denied* (2002), *cert. denied,* 538 U.S. 906, 123 S.Ct. 1484, 155 L.Ed.2d 226 (2003); *Karuk Tribe of Cal. v. Ammon,* 209 F.3d 1366, 1374 (Fed.Cir.), *reh'g and reh'g en banc denied* (2000), *cert. denied,* 532 U.S. 941, 121 S.Ct. 1402, 149 L.Ed.2d 345 (2001). Therefore, to succeed, a takings plaintiff must have a legally cognizable property interest, such as the right of possession, use or disposal of the property. *See Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 435, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982) (citing *United States v. Gen. Motors Corp.,* 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311 (1945)); *Karuk Tribe of Cal. v. Ammon,* 209 F.3d at 1374–75; *Skip Kirchdorfer, Inc. v. United States,* 6 F.3d 1573, 1580 (Fed. Cir.), *reh'g denied* (1993). The power of a property owner to exclude "has traditionally been considered one of the most treasured strands in an owner's bundle of property rights." *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. at 435, 102 S.Ct. 3164.

If a plaintiff has a valid property interest, the government "takes" that interest by de-stroying, physically occupying, or excessively regulating it for a public purpose. *Boyle v. United States,* 200 F.3d 1369, 1374 (Fed.Cir. 2000). Furthermore, "[w]hen the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner, regardless of whether the interest that is taken constitutes an entire parcel or merely a part thereof." *Brown v. Legal Found. of Washington,* 538 U.S. 216, 233, 123 S.Ct. 1406, 155 L.Ed.2d 376 (2003) (citations omitted) (quoting *Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency,* 535 U.S. 302, 321–23, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002)). Consistent with this notion, the United States Supreme Court has noted that most takings cases fall within two distinct classes:

> Where the government authorizes a physical occupation of property (or actually takes title), the Takings Clause generally requires compensation. But where the government merely regulates the use of property, compensation is required only if considerations such as the purpose of the regulation or the extent to which it deprives the owner of the economic use of the property suggest that the regulation has unfairly singled out the property owner to bear a burden that should be borne by the public as a whole. The first category of cases requires courts to apply a clear rule; the second necessarily entails complex factual assessments of the purposes and economic effects of government actions.

*Yee v. City of Escondido, Cal.,* 503 U.S. 519, 522–23, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992) (citations omitted); *accord Abrahim–Youri v. United States,* 139 F.3d 1462, 1465 (Fed.Cir.1997) (physical takings are "based on an outright governmental seizure or occupation of private property," while regulatory takings are "based on a regulatory imposition that constrains an owner's continuing use of property"), *cert. denied sub nom. Gurney v. United States,* 524 U.S. 951, 118 S.Ct. 2366, 141 L.Ed.2d 735, *reh'g denied,* 524 U.S. 970, 119 S.Ct. 14, 141 L.Ed.2d 775 (1998).

In this case, the parties have asked the court to determine whether the plaintiffs

have a property interest in the land through which the right-of-way passes or whether the government retained a reversionary interest in that land when the right-of-way is no longer used for its intended purpose, operating a railroad. If the plaintiffs hold no property interest in the land through which the right-of-way was granted, the plaintiffs cannot claim that the United States effected a taking when it issued the NITU, which authorized the conversion of the railroad right-of-way into a trail.

The National Trails System Act Amendments of 1983 authorize the Surface Transportation Board, to preserve for possible future railroad use, rights-of-way not currently in service, and to allow interim use of the land as recreational trails. *See* 16 U.S.C. § 1247(d); *see also Preseault v. Interstate Commerce Comm'n*, 494 U.S. at 6, 110 S.Ct. 914. The statute at 16 U.S.C. § 1247(d) provides that a railroad wishing to cease operations along a particular route may negotiate with a third party, whether a state, municipality, or private group that is prepared to assume financial and managerial responsibility for the right-of-way. *See* 16 U.S.C. § 1247(d); *see also* 49 U.S.C. § 10904 (1994); 49 C.F.R. § 1152.29 (1998); *Preseault v. Interstate Commerce Comm'n*, 494 U.S. at 6–7, 110 S.Ct. 914; *Caldwell v. United States*, 391 F.3d 1226, 1229 (Fed.Cir.2004). A third party interested in acquiring the railway for interim trail use must file with the STB a "Statement of Willingness to Assume Financial Responsibility." 49 C.F.R. § 1152.29(a). The railroad company then must notify the STB of its willingness to negotiate an agreement with the third party regarding the use of the railway. If the railway is willing to negotiate and no continued rail service occurs, then the STB can issue a "Notice of Interim Trail Use or abandonment (NITU)." 49 C.F.R. § 1152.29(d)(1); *see also Preseault v. Interstate Commerce Comm'n*, 494 U.S. at 7 n. 5, 110 S.Ct. 914.

The issuance of a NITU allows a railroad to discontinue rail service and postpones the STB's abandonment authorization for 180 days, during which time the railroad can discontinue service and negotiate with interested third parties. *See* 49 C.F.R. § 1152.29(d); *Burlington Northern & Santa Fe Ry. Co.—Abandonment Exemption—in King County, WA*, STB Docket No. AB–6 (Sub. No. 380X), 1998 WL 638432 (Sept. 16, 1998). If the parties reach an agreement, the land may be transferred to the trail operator for interim trail use, subject to federally-imposed terms and conditions, including the right of the railroad to reassert control and revive rail service. *See* 49 C.F.R. § 1152.29(d)(2) ("The NITU will indicate that interim trail use is subject to future restoration of rail service . . . ."). Pursuant to 16 U.S.C. § 1247(d), "if such interim use is subject to restoration or reconstruction for railroad purposes, such interim use shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes." If no agreement is reached, the railroad is authorized to abandon the rail line after the 180 days expire. If an agreement is reached within the 180 days, the railroad right-of-way is considered rail banked and the agreed upon interim trail use is permitted under the NITU. *See Preseault v. Interstate Commerce Comm'n*, 494 U.S. at 7 n. 5, 110 S.Ct. 914; *Becker v. Surface Transp. Bd.*, 132 F.3d 60, 63 (D.C.Cir.1997); *Birt v. Surface Transp. Bd.*, 90 F.3d 580, 582, *reh'g denied and suggestion for reh'g en banc denied*, 98 F.3d 644 (D.C.Cir.1996).

In the case currently before the court, the STB granted Burlington Northern's request for an exemption, authorizing Burlington Northern to abandon a line of railroad and to enter into negotiations with third parties to take over the financial responsibility of the right-of-way on the eastern shore of Lake Sammamish. *See Burlington Northern & Santa Fe Ry, Co.—Abandonment Exemption-in King County, WA*, STB Docket No. AB–6 (Sub. No. 380X), 1998 WL 638432 (Sept. 16, 1998). Through an agreement with Burlington Northern, The Land Conservancy (TLC) of Seattle agreed to take over the liability and financial responsibility of Burlington Northern's right-of-way and the railroad line running through the plaintiffs' property. *See id.* TLC and King County subsequently requested that the STB impose interim trail use under 16 U.S.C. § 1247(d). The STB approved their request and issued a

NITU. *See id.* The NITU was subsequently implemented in an agreement for interim trail use between Burlington Northern and TLC and, later, between the TLC and King County. *See id.*

The disposition of the railroad right-of-way along Lake Sammamish has been a "highly contentious matter," with many property owners fighting to stop the right-of-way from being used as a trail. *See Redmond–Issaquah R.R. Pres. Ass'n v. Surface Transp. Bd.,* 223 F.3d at 1058. In July, 1997, for example, TLC sued the plaintiffs, Mr. and Mrs. Beres for trespassing on the King County right-of-way. Mr. and Mrs. Beres were fined and held in contempt. In March, 2001, King County filed a quiet title action against Mr. and Mrs. Beres based on the STB's rail banking order and state law, which was granted and affirmed on appeal. *See King County v. Beres,* 118 Wash.App. 1003, 2003 WL 21907632, at *3 (Wash.App. Div. 1 Aug. 11, 2003), *review denied,* 151 Wash.2d 1018, 91 P.3d 94 (Wash.2004).

Private property interests have generally been determined under applicable state law, particularly when the right-of-way granted to the railroad is by a private deed. *See Preseault v. Interstate Commerce Comm'n,* 494 U.S. at 8, 21, 110 S.Ct. 914. According to the unanimous opinion in *Preseault,* written by Justice Brennen:

> ... because many railroads do not own their rights-of-way outright but rather hold them under easements or similar property interests .... State law generally governs the disposition of reversionary interests, subject of course to the ICC's "exclusive and plenary" jurisdiction to regulate abandonments and to impose conditions affecting post abandonment use of the property.

*Preseault v. Interstate Commerce Comm'n,* 494 U.S. at 8, 110 S.Ct. 914. Justice O'Connor, however, in a concurring opinion in *Preseault,* in which Justices Scalia and Kennedy concurred, stated: "I join the Court's opinion, but write separately to express my view that state law determines what property interest petitioners possess and that traditional takings doctrine will determine whether the Government must compensate petitioners for the burden imposed on any property interest they possess." *Id.* at 20, 110 S.Ct. 914; *see also Glosemeyer v. United States,* 45 Fed.Cl. 771, 776–79 (2000) (reviewing private railroad easements, and stating that "when a federal court analyzes the effect of federal action on real property, it must utilize the law of the situs, in this case Missouri."). Citing *Great Northern Railway Company v. United States,* 315 U.S. 262, 62 S.Ct. 529, 86 L.Ed. 836 (1942) and *Idaho v. Oregon Short Line Railroad Company,* 617 F.Supp. 207 (D.Idaho 1985), Justice O'Connor, however, implied in *Preseault* that federal grants of railway easements could influence the outcome of some land disputes if a federal role is present. *Preseault v. Interstate Commerce Comm'n,* 494 U.S. at 20, 110 S.Ct. 914.

In the case before this court, the railroad company's right-of-way was granted under the 1875 Act, not by a private land transfer. Therefore, defining the intentions of Congress as to the property interests impacted by the federal statute is an issue of federal law. *See Leo Sheep Co. v. United States,* 440 U.S. 668, 682, 99 S.Ct. 1403, 59 L.Ed.2d 677 (1979). In *Leo Sheep,* public land was granted to the Union Pacific Railroad by the Union Pacific Act of 1862. *See id.* at 669, 99 S.Ct. 1403. The intent of the 1862 Act, like the 1875 Act, was to effectuate construction of a transcontinental railroad. The *Leo Sheep* Court quoted a much earlier case and wrote: "The solution of [ownership] questions [involving the railroad grants] depends, of course, upon the construction given to the acts making the grants; and they are to receive such a construction as will carry out the intent of Congress, however difficult it might be to give full effect to the language used if the grants were by instruments of private conveyance." *Id.* at 682, 99 S.Ct. 1403 (quoting *Winona & St. Peter R.R. Co. v. Barney,* 113 U.S. 618, 625, 5 S.Ct. 606, 28 L.Ed. 1109 (1885)); *see also King County v. Burlington N. R.R. Corp.,* 885 F.Supp. 1419, 1423 n. 6 (W.D.Wash.1994) ("[T]he instant case deals with a right-of-way created by a federal *grant* [the Northern Pacific Land Grant Act of 1864] .... To the extent that [the defendant's] argument in this regard is that this case may be decided entirely by

reference to Washington state law, the Court rejects that argument.") (emphasis in original).

The existence of a distinction regarding when state or federal law governs in specific circumstances also is accepted by the Supreme Court of Washington, the highest state court in the state in which the plaintiffs' property is located, and a court that maintains an interest in managing property rights within its own state. *See Brown v. Washington*, 130 Wash.2d 430, 924 P.2d 908, 917, *recons. denied* (1996) (" '[E]asements' on public lands are granted by Congress and subject to the intentions and specifications of Congress rather than common law.") (citing *Idaho v. Oregon Short Line*, 617 F.Supp. at 212; *Barney v. Burlington N. R.R. Co.*, 490 N.W.2d 726, 731 (S.D.1992), *cert. denied sub nom. Kaubisch v. South Dakota*, 507 U.S. 914, 113 S.Ct. 1265, 122 L.Ed.2d 661 (1993)).

The parties to this lawsuit agree that statutorily created railroad easements and rights-of-way cannot be analyzed in the same manner as common law easements or rights-of-way transferred between private parties by deed or grant. In fact, the defendant supports its argument that the plaintiffs hold no interest in the railroad right-of-way by arguing that "congressional grants of railroad easements across public lands are not like common easements." The defendant argues that " 'easements' granted for rights-of-way under federal railroad statutes are unique, statutory interests that have many attributes of a 'fee' interest, including the ability to retain a reversionary interest," for which reason, the defendant claims, an abandoned or extinguished easement does not pass to the adjacent land owner. The plaintiff also recognizes that "a railroad easement is a substantial thing and is probably broader in scope than is often found in other contexts," but argues that the "[d]efendant goes too far in suggesting that the easement is actually a 'fee-type interest.' "

The defendant cites to language in *Whipps Land and Cattle Company v. Level 3 Communications, LLC*, in which the Nebraska Supreme Court stated that, "while the vocabulary of the common law of real property is often imported into the discussion of railroad rights-of-way, where those rights-of-way have been created by federal law, they are entirely creatures of federal statute, and their scope and duration are determined, not by common law principles, but by the relevant statutory provisions." *Whipps Land & Cattle Co. v. Level 3 Communications, LLC*, 265 Neb. 472, 658 N.W.2d 258, 264 (2003) (citing *Brown v. Washington*, 924 P.2d at 917). The defendant further argues, quoting *Idaho v. Oregon Short Line Railroad Company*, that Congress was within its authority to pre-empt or override common-law rules regarding easements, reversions, or other traditional real property interests. The defendant argues that even if the 1875 Act granted only an easement, it does not reasonably follow that Congress did not intend to retain an interest in that easement. According to the defendant, "[t]he precise nature of the retained interest following a federal grant of railroad right-of-way need not be 'shoe-horned' into any specific category cognizable under the rules of real property law." *Idaho v. Oregon Short Line R.R. Co.*, 617 F.Supp. at 212.

To support its argument that the United States retained a reversionary interest in the right-of-way granted to the Seattle Railroad Company, the defendant also relies upon the theory of construction that "land grants are construed favorably to the Government, that nothing passes except what is conveyed in clear language, and that if there are doubts they are resolved for the Government, not against it." *Watt v. W. Nuclear, Inc.*, 462 U.S. 36, 59, 103 S.Ct. 2218, 76 L.Ed.2d 400 (1983) (quoting *United States v. Union Pac. R.R. Co.*, 353 U.S. 112, 116, 77 S.Ct. 685, 1 L.Ed.2d 693 (1957)); *see also California ex rel. State Lands Comm'n v. United States*, 457 U.S. 273, 287, 102 S.Ct. 2432, 73 L.Ed.2d 1 (1982) ("[F]ederal grants are to be construed strictly in favor of the United States."), *reh'g denied*, 458 U.S. 1131, 103 S.Ct. 14, 73 L.Ed.2d 1401, *judgment entered*, 459 U.S. 1, 103 S.Ct. 250, 74 L.Ed.2d 1 (1982). The defendant argues that when the United States patented Lot 4 to the plaintiffs' predecessor in interest, William H. Cowie, Mr. Cowie took Lot 4 "subject to" the railroad's "easement" and, according to the

defendant, subject to the United States' reversionary interest. Therefore, the defendant maintains that the plaintiffs do not possess any vested property interest in the land through which the right-of-way was granted, and that the plaintiffs' claim that their property interest was taken from them when the 1875 Act lands were converted to trail use must be dismissed.

Plaintiffs, however, argue that defendant's understanding of the term "reversionary interest" in the context of federal grants of railroad rights-of-way under the 1875 Act is incorrect. The plaintiffs contend that the right-of-way granted by the government to the railroad was merely an easement, and upon its abandonment, the easement is properly characterized as being "extinguished." The plaintiffs further argue that "it is a general rule that when a [land] patent issues, such as the one to Mr. Cowie, in accordance with governing statutes, all title and control of the land passes from the United States." *See Swendig v. Washington Water Power Co.,* 265 U.S. 322, 331, 44 S.Ct. 496, 68 L.Ed. 1036 (1924) ("[I]t is true as a general rule, that ... when a patent issues in accordance with governing statutes, all title and control of the land passes from the United States."). To support their argument, the plaintiffs quote the United States Supreme Court, which stated as early as 1893 that:

> Doubtless whoever obtained title from the government to any quarter section of land through which ran this right of way would acquire a fee to the whole tract, subject to the easement of the company; and if ever the use of that right of way was abandoned by the railroad company, the easement would cease, and the full title to that right of way would vest in the patentee of the land.

*Smith v. Townsend,* 148 U.S. 490, 499, 13 S.Ct. 634, 37 L.Ed. 533 (1893). According to the plaintiffs, the United States retained no reversionary interest when it patented the land to William H. Cowie, without explicitly retaining such an interest. Therefore, plaintiffs claim that when the railroad ceased to use the right-of-way for railroad purposes, and the tracks were removed, the United States took their property without just compensation when the right-of-way was converted to a trail.

The somewhat careless, interchangeable use of property terms of art such as "right-of-way," "easement" and "fee" over the years by private property owners, government entities and the courts, when referring to property interests in the context of railroad rights-of-way, has made the task of understanding the property interest claimed by these plaintiffs more difficult. *See Wyoming v. Udall,* 379 F.2d 635, 640 (10th Cir.1967) ("For the purposes of this case, we are not impressed with the labels applied to the title of the railroads in their rights-of-way across the public lands of the United States."), *cert. denied,* 389 U.S. 985, 88 S.Ct. 470, 19 L.Ed.2d 479 (1967); *see also Idaho v. Oregon Short Line,* 617 F.Supp. at 210 (recognizing that "[b]ecause exclusive use and occupancy are not rights comprised within the traditional definition of an easement, definitional problems later arose in describing the nature of a railroad's interest in its right-of-way.").

In *Preseault v. United States,* the United States Court of Appeals for the Federal Circuit wrote: "The usual way in which such [a railroad] easement ends is by abandonment, which causes the easement to be extinguished by operation of law. Upon an act of abandonment, the then owner of the fee estate, the 'burdened' estate, is relieved of the burden of the easement." *Preseault v. United States,* 100 F.3d 1525, 1545 (Fed.Cir.1996) (citations omitted). Respecting the term "easement," the Federal Circuit, in a case in which a railroad was deeded a right-of-way, indicated that traditional property law terminology requires that a termination of an easement "would not cause anything to 'revert' to the landowner. Rather, the burden of the easement would simply be extinguished, and the landowner's property would be held free and clear of any such burden." *Toews v. United States,* 376 F.3d 1371, 1376 (Fed.Cir.), *reh'g denied* (2004). Furthermore, the United States District Court for the District of Columbia, in one of the many actions in which Mr. and Mrs. Beres have fought to establish their interest in the railroad right-of-way, explained that where "the right-of-way is an easement, the owner of the

servient tenement retains title to the underlying land ...." *Nat'l Wildlife Fed'n v. Interstate Commerce Comm'n,* 850 F.2d 694, 703 (D.C.Cir.1988). Under common law, "[b]ecause an easement is a servitude, rather than an estate in land, it is not strictly accurate to speak of an easement 'reverting;' rather such interests 'lapse' or are 'extinguished.'" *Id.* at n. 13. Analytically, therefore, if the right-of-way granted to the Seattle Railroad Company under the 1875 Act is considered a standard easement, there would be no "reversionary rights" in the right-of-way for the United States to retain. Under such a scenario, to apply the words of the Federal Circuit, the interest held by the railroad would "simply be extinguished" and the plaintiffs in this case would retain unburdened title to the land underlying the right-of-way. *Toews v. United States,* 376 F.3d at 1376.

At issue in the case currently before the court is much more than just a semantic argument, or automatic application of terminology. The analysis necessary to resolve the plaintiffs' dispute regarding reversionary interests also is not made easier by the absence of definitional terms in the 1875 Act, or discussion in the legislative history of that Act. Furthermore, no assistance can be found in the words of the land patent given to William H. Cowie in 1892. The land patent, which was presented as an exhibit to this court, does not mention any rights-of-way or reversionary interests, although under the 1875 Act, any future land transfers were required to preserve the railroad right-of-way. *See* Act of 1875, at § 4. Indeed, the only interests retained by the United States in the language of the land patent issued to William H. Cowie were water and mineral rights.

The defendant's motion for summary judgment presents the task of identifying what interest, if any, the United States retained when it granted the right-of-way to the Seattle Railroad Company under the 1875 Act and, later, when it patented the land to William H. Cowie. The court's analysis begins with the plain language of the 1875 Act and the words of the land patent given to Mr. Cowie. *See Leocal v. Ashcroft,* —— U.S. ——, ——, 125 S.Ct. 377, 382, 160 L.Ed.2d 271 (2004) ("Our analysis begins with the language of the statute."); *Intel Corp. v. Advanced Micro Devices, Inc.,* 542 U.S. 241, ——, 124 S.Ct. 2466, 2477, 159 L.Ed.2d 355 (2004) ("As 'in all statutory construction cases, we begin ... with the language of the statute.'") (quoting *Barnhart v. Sigmon Coal Co., Inc.,* 534 U.S. 438, 450, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002)); *Duncan v. Walker,* 533 U.S. 167, 172, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001) ("Our task is to construe what Congress has enacted .... We begin, as always, with the language of the statute."); *Carter v. United States,* 530 U.S. 255, 257, 120 S.Ct. 2159, 147 L.Ed.2d 203 (2000) ("[T]he Court's inquiry begins with the textual product of Congress' efforts, not with speculation as to the internal thought processes of its Members.").

The first step is "to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Barnhart v. Sigmon Coal Co., Inc.,* 534 U.S. at 450, 122 S.Ct. 941 (quoting *Robinson v. Shell Oil Co.,* 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997)). The inquiry ceases "if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.'" *Id.* (quoting *Robinson v. Shell Oil Co.,* 519 U.S. at 340, 117 S.Ct. 843). In interpreting the plain meaning of the statute, it is the court's duty, if possible, to give meaning to every clause and word of the statute. *See TRW Inc. v. Andrews,* 534 U.S. 19, 31, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001) ("It is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'") (quoting *Duncan v. Walker,* 533 U.S. at 173, 121 S.Ct. 2120); *Williams v. Taylor,* 529 U.S. 362, 404, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (describing as a "cardinal principle of statutory construction" the rule that every clause and word of a statute must be given effect if possible). Similarly, the court must avoid an interpretation of a clause or word which renders other provisions of the statute inconsistent, meaningless, or superfluous. *See Duncan v. Walker,* 533 U.S. at 167, 121 S.Ct. 2120

(noting that courts should not treat statutory terms as "surplusage"). "[W]hen two statutes are capable of co-existence, it is the duty of the courts ... to regard each as effective." *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 155, 96 S.Ct. 1989, 48 L.Ed.2d 540 (1976); *see also Hanlin v. United States*, 214 F.3d 1319, 1321, *reh'g denied* (Fed.Cir.2000).

A court must not stray from the statutory definition of a term. *See Whitfield v. United States*, — U.S. —, —, 125 S.Ct. 687, 691, 160 L.Ed.2d 611 (2005) (It is a "settled principle of statutory construction that, absent contrary indications, Congress intends to adopt the common law definition of statutory terms.") (quoting *United States v. Shabani*, 513 U.S. 10, 13–14, 115 S.Ct. 382, 130 L.Ed.2d 225 (1994)); *see also Stenberg v. Carhart*, 530 U.S. 914, 942, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000); *Meese v. Keene*, 481 U.S. 465, 484–85, 107 S.Ct. 1862, 95 L.Ed.2d 415 (1987); *Colautti v. Franklin*, 439 U.S. 379, 392 n. 10, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979). "It is axiomatic that the statutory definition of the term excludes unstated meanings of that term." *Meese v. Keene*, 481 U.S. at 484–85, 107 S.Ct. 1862. As the United States Court of Appeals for the Federal Circuit stated in *AK Steel Corporation:*

> When Congress makes such a clear statement as to how categories are to be defined and distinguished, neither the agency nor the courts are permitted to substitute their own definition for that of Congress, regardless of how close the substitute definition may come to achieving the same result as the statutory definition, or perhaps a result that is arguably better.

*AK Steel Corp. v. United States*, 226 F.3d 1361, 1372 (Fed.Cir.2000). When a word is undefined, courts regularly give that term its ordinary meaning. *See Whitfield v. United States*, 125 S.Ct. at 691 (2005); *Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187, 115 S.Ct. 788, 130 L.Ed.2d 682 (1995); *AK Steel Corp. v. United States*, 226 F.3d at 1371.

A single term should not be read in isolation. *See Koons Buick Pontiac GMC, Inc. v. Nigh*, — U.S. —, —, 125 S.Ct. 460, 466, 160 L.Ed.2d 389 (2004) ("Statutory construction is a 'holistic endeavor' .... A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme because the same terminology is used elsewhere in a context that makes its meaning clear, or because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law.") (quoting *United Sav. Assn. of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988)); *see also United States v. Cleveland Indians Baseball Co.*, 532 U.S. 200, 217, 121 S.Ct. 1433, 149 L.Ed.2d 401 (2001). "Words are not pebbles in alien juxtaposition; they have only a communal existence; and not only does the meaning of each interpenetrate the other, but all in their aggregate take their purport from the setting in which they are used." *King v. Saint Vincent's Hosp.*, 502 U.S. 215, 221, 112 S.Ct. 570, 116 L.Ed.2d 578 (1991) (quoting *NLRB v. Federbush Co.*, 121 F.2d 954, 957 (2d Cir.1941)).

When the statute provides a clear answer, the court's analysis is at an end. *See Barnhart v. Sigmon Coal Co. Inc.*, 534 U.S. at 450, 122 S.Ct. 941. Thus, when the "statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.'" *Johnson v. United States*, 529 U.S. 694, 723, 120 S.Ct. 1795, 146 L.Ed.2d 727 (2000) (quoting *United States v. Ron Pair Enterps., Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (quoting *Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917))). In such instances, the court should not consider "conflicting agency pronouncements" or "extrinsic evidence of a contrary intent." *Weddel v. Sec'y of Dep't of Health and Human Servs.*, 23 F.3d 388, 391 (Fed.Cir.) (citing *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 476, 112 S.Ct. 2589, 120 L.Ed.2d 379 (1992) (noting that courts must not defer to agency interpretation contrary to the intent of Congress evidenced by unambiguous language) and *Darby v. Cisneros*, 509 U.S. 137, 147, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993)), *reh'g denied, en banc suggestion declined* (1994). "[O]nly language that meets the constitutional requirements of bicameralism and presentment has true legal authority." *Weddel v. Sec'y of Dep't of Health and Human Servs.*, 23 F.3d at 391 (citing *INS v. Chadha*, 462

U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983)). " '[C]ourts have no authority to enforce [a] principl[e] gleaned solely from legislative history that has no statutory reference point.' " *Shannon v. United States,* 512 U.S. 573, 583–84, 114 S.Ct. 2419, 129 L.Ed.2d 459 (1994) (quoting *Int'l Bhd. of Elec. Workers, Local Union No. 474 v. NLRB,* 814 F.2d 697, 712 (D.C.Cir.1987)). Consequently, if a statute is plain and unequivocal on its face, there is usually no need to resort to the legislative history underlying the statute. *See Whitfield v. United States,* 125 S.Ct. at 692 ("Because the meaning of [the statute's] text is plain and unambiguous, we need not accept petitioners' invitation to consider the legislative history ...."); *Chamberlain Group, Inc. v. Skylink Techs., Inc.,* 381 F.3d 1178, 1196 (Fed.Cir.) ("Though 'we do not resort to legislative history to cloud a statutory text that is clear,' *Ratzlaf v. United States,* 510 U.S. 135, 147–48, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994), we nevertheless recognize that 'words are inexact tools at best, and hence it is essential that we place the words of a statute in their proper context by resort to the legislative history.' ") (quoting *Tidewater Oil Co. v. United States,* 409 U.S. 151, 157, 93 S.Ct. 408, 34 L.Ed.2d 375 (1972)), *reh'g and reh'g en banc denied* (2004).

There are only limited instances when resort to legislative history may be appropriate. For example, a court may consider legislative history if:

> [T]he plain meaning produces a result that is not just "harsh," *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 576, 102 S.Ct. 3245, 3252, 73 L.Ed.2d 973 (1982), "curious," *Tennessee Valley Auth. v. Hill,* 437 U.S. 153, 172, 98 S.Ct. 2279, 2291, 57 L.Ed.2d 117 (1978), or even "stark and troubling," *Estate of Cowart,* 505 U.S. at 483, 112 S.Ct. at 2598, but "so bizarre that Congress 'could not have intended' it," *Demarest v. Manspeaker,* 498 U.S. 184, 186, 190–91, 111 S.Ct. 599, 601–02, 603–04, 112 L.Ed.2d 608 (1991).

*Weddel v. Sec'y of Dep't of Health and Human Servs.,* 23 F.3d at 391. Moreover, legislative history may be introduced into the analysis to resolve an ambiguously worded statute. *Ratzlaf v. United States,* 510 U.S. at 148 n. 18, 114 S.Ct. 655 (citing *Barnhill v. Johnson,* 503 U.S. 393, 401, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992)); *Patterson v. Shumate,* 504 U.S. 753, 761, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992).

"If legislative history is to be considered, it is preferable to consult the documents prepared by Congress when deliberating." *Gustafson v. Alloyd Co.,* 513 U.S. 561, 580, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995). "[T]he authoritative source for finding the Legislature's intent lies in the Committee Reports on the bill, which 'represen[t] the considered and collective understanding of those Congressmen involved in drafting and studying proposed legislation.' " *Garcia v. United States,* 469 U.S. 70, 76, 105 S.Ct. 479, 83 L.Ed.2d 472 (1984) (quoting *Zuber v. Allen,* 396 U.S. 168, 186, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969)). In exceptional circumstances, when there is no legislative history that helps resolve the ambiguity in the statute, the court may consider a "look beyond the statutory language to the statute's purpose to determine its meaning." *Candle Corp. of America v. United States Int'l Trade Comm'n,* 374 F.3d 1087, 1093 (Fed.Cir.) (citing *Holloway v. United States,* 526 U.S. 1, 9, 119 S.Ct. 966, 143 L.Ed.2d 1 (1999)) (noting that "statutory language should be interpreted consonant with the provisions of the whole law, and ... its object and policy"), *reh'g and reh'g en banc denied* (2004).

Subsequent legislative history is a " 'hazardous basis for inferring the intent of an earlier' Congress." *Pension Benefit Guar. Corp. v. LTV Corp.,* 496 U.S. 633, 650, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990) (quoting *United States v. Price,* 361 U.S. 304, 313, 80 S.Ct. 326, 4 L.Ed.2d 334 (1960)) (addressing the legislative history of later amendments to an earlier statute); *see also United States v. X–Citement Video. Inc.,* 513 U.S. 64, 77 n. 6, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994) ("[T]he views of one Congress [in a House Committee Report] as to the meaning of an Act passed by an earlier Congress are not ordinarily of great weight ... and the views of the committee of one House of another Congress are of even less weight."). Common sense supports this view. But the Supreme Court also has suggested that "subsequent

legislation declaring the intent of an earlier statute is entitled to great weight in statutory construction." *Loving v. United States,* 517 U.S. 748, 770, 116 S.Ct. 1737, 135 L.Ed.2d 36 (1996) (quoting *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 380–81, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969)).

The distinction appears to be between subsequent "legislation," as in *Loving* and subsequent legislative history as in *Pension Benefit Guaranty Corporation.* But in *Waterman Steamship Corporation v. United States,* the United States Supreme Court wrote:

> This Court has pointed out on previous occasions that "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." *United States v. Price,* 361 U.S. 304, 313, 80 S.Ct. 326, 332, 4 L.Ed.2d 334; *United States v. Philadelphia National Bank,* 374 U.S. 321, 348—349, 83 S.Ct. 1715, 1733, 10 L.Ed.2d 915. This is particularly true where a President (the same President who signed the original Act) vetoes a "clarifying" amendment on the grounds that, in his view, it does not clarify but rather vitiates the intent of the Congress that passed the original Act. As this Court held in *Fogarty v. United States,* 340 U.S. 8, 71 S.Ct. 5, 95 L.Ed. 10 in considering a similar situation, the abortive action of the subsequent Congress "would not supplant the contemporaneous intent of the Congress which enacted the Act." *Id.,* at 14, 71 S.Ct. at 8. *See also United States v. Wise,* 370 U.S. 405, 411, 82 S.Ct. 1354, 1358, 8 L.Ed.2d 590.

*Waterman S.S. Corp. v. United States,* 381 U.S. 252, 269, 85 S.Ct. 1389, 14 L.Ed.2d 370 (1965).

Because legislative goals change over the years, the risk of using subsequent legislation or subsequent legislative history to interpret the intent of an earlier congressional enactment is intuitively obvious. Resort to using subsequent congressional activity of any variety to interpret earlier legislation should be cautiously approached, especially if more direct means are available, such as the clear meaning of the statute. Silence or omission in a statute is an intentional act and can be just as significant as specific statutory direction. *See West Virginia Univ. Hosps., Inc. v. Casey,* 499 U.S. 83, 101, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991) ("What the Government asks is not a construction of a statute, but, in effect, an enlargement of it by the court, so that what was omitted, presumably by inadvertence, may be included within its scope. To supply omissions transcends the judicial function.") (quoting *Iselin v. United States,* 270 U.S. 245, 250–251, 46 S.Ct. 248, 70 L.Ed. 566 (1926)); *FAG Italia S.p.A. v. United States,* 291 F.3d 806, 816 (Fed.Cir.2002); *Babbitt v. Oglala Sioux Tribal Pub. Safety Dep't,* 194 F.3d 1374, 1378 (Fed.Cir.1999), *cert. denied,* 530 U.S. 1203, 120 S.Ct. 2196, 147 L.Ed.2d 233 (2000).

The 1875 Act states that "the right of way through the public lands of the United States is hereby granted to any railroad company duly organized under the laws of any State or Territory, except the District of Columbia, or by Congress of the United States, which shall have filed with the Secretary of the Interior a copy of its articles of incorporation . . . ." Act of 1875, at § 1. The choice especially of the words "through the public lands of the United States" indicates that, pursuant to the 1875 Act, even after the railroad is granted a right-of-way, the federal government is still the owner of the public land over which the right-of-way is granted, and the lands remain "of the United States." *See id.* There are no words included in the 1875 Act to indicate that the railroad receives anything other than a right-of-way, in the nature of the right to traverse, as those words would be understood by a reasonable person. The concept of a reversionary right in the future is not included or even intimated in the 1875 Act. Nor is there in the 1875 Act any indication that the right transferred to the railroad is in the nature of a fee. Furthermore, the 1875 Act contains no restrictions on future fee simple transfers of the public land through which the railroad right-of-way is granted to other government or private parties by the United States.

There is in the 1875 Act a requirement that future transfers of lands through which the right-of-way passes shall be disposed of subject to the right-of-way. Act of 1875, at § 4. If, under the 1875 Act, the land was to

be transferred to the railroad with a fee interest, there would have been no need for a requirement in the statute that future transfers of land through which the right-of-way passes be made subject to the right-of-way.

◼ In this case, the plaintiffs' interest also derives from the language of the land patent issued to Mr. Cowie in 1892. A federal land patent "is intended to quiet title to and secure the enjoyment of the land for the patentees and their successors." *Grainger v. United States,* 197 Ct.Cl. 1018, 1024 (1972) (citing *Dominguez De Guyer v. Banning,* 167 U.S. 723, 743–4, 17 S.Ct. 937, 42 L.Ed. 340 (1897); *City of Los Angeles v. San Pedro, L.A. & S.L. R. Co.,* 182 Cal. 652, 189 P. 449 (1920)). Therefore, a patent which is "regular in form and for whose issuance there is statutory authority is so binding on the government that a purchaser from the patentee need make no investigation as to the details of its issuance the legal title has passed and the patent is conclusive against the government. The [government] loses its jurisdiction over the land as soon as a valid patent is issued." *United States v. Eaton Shale Co.,* 433 F.Supp. 1256, 1267 (D.C.Colo.1977) (quoting 2 Patton on Land Title, § 292, at 26–27). Furthermore, "[a] patent to land, issued by the United States under authority of law, is the highest evidence of title, something upon which its holder can rely for peace and security in his possession. It is conclusive evidence of title against the United States and all the world, until cancelled or modified by an action brought for this purpose." *Nichols v. Rysavy,* 610 F.Supp. 1245, 1254 (D.S.D.1985) (quoting 2 The American Law of Mining, § 1.29, at 357), *aff'd,* 809 F.2d 1317 (8th Cir.), *cert. denied,* 484 U.S. 848, 108 S.Ct. 147, 98 L.Ed.2d 103 (1987).

◼ As the United States Supreme Court has stated, "when a patent issues in accordance with governing statutes, all title and control of the land passes from the United States." *Swendig v. Washington Water Power Co.,* 265 U.S. at 331, 44 S.Ct. 496 (citing *United States v. Schurz,* 102 U.S. 378, 396, 26 L.Ed. 167 (1880)). Thus, the United States Supreme Court recognizes the sanctity of land transfers, and has expressed reluctance to interfere with land rights in which

no reservations were present when conferred, stating that: "Generations of land patents have issued without any express reservation of the right now claimed by the Government .... This Court has traditionally recognized the special need for certainty and predictability where land titles are concerned, and we are unwilling to upset settled expectations to accommodate some ill defined power to construct public thoroughfares without compensation." *Leo Sheep Co. v. United States,* 440 U.S. at 687–88, 99 S.Ct. 1403.

◼ Therefore, the language of the land patent issued to Mr. Cowie must be reviewed to determine the limits or reservations present in the patent, if any. In reviewing a land patent issued by the United States, the intentions of the government are binding. Thus, at the time of the land transfer, "if the federal government intended to retain the [land] as public land, then the [land] remain[s] the property of the United States. *See Oklahoma v. Texas,* 258 U.S. 574, 594–95, 42 S.Ct. 406, 414, 66 L.Ed. 771 (1922) ('If by... the terms of its patent [the government] has shown that it intended to restrict the conveyance..., that intention will be controlling.')." *Koch v. United States Dep't of Interior,* 47 F.3d 1015, 1019 (10th Cir.), *reh'g denied* (1995).

◼ The plain language of the land patent granted to William H. Cowie in 1892 did not address a reversionary interest in the United States regarding the land subject to the right-of-way granted to the railroad, which at the time had been granted to and recently secured by the Seattle Railroad Company between 1887 and 1891. The only reservations made by the United States in the land patent given to Mr. Cowie were described as follows:

> subject to any vested and accrued water rights for mining, agriculture, manufacturing, or other purposes, and rights to ditches and reservoirs used in connection with such water rights as may be recognized and acknowledged by the local customs, laws, and decisions of courts, and also subject to the right of the proprietor of the vein or lode to extract and remove his ore

therefrom, should the same be found to penetrate or intersect the premises hereby granted, as provided by law.

Although it could have done so at the time, the United States did not reserve any reversionary interest in the land subject to the railroad right-of-way in the language of the land patent given to Mr. Cowie, and signed by E. Woofenland, Assistant Secretary of the Department of Interior, on behalf of President Benjamin Harrison. The only reservations of rights expressly made by the United States in the land patent issued to William H. Cowie were for water and mineral rights, although the land patent was issued to Mr. Cowie in 1892, a time when the government also was actively in the business of granting railroad rights-of-way.

Despite the plain meaning of the words of the 1875 Act, and the plain meaning of the words of the land patent issued to William H. Cowie, neither of which reserve a reversionary right in the United States or suggest that the railroad held a "fee," or "in the nature of a fee interest," in the right-of-way, the defendant argues to the contrary. The defendant cites to the historical context of the 1875 Act and later legislation, as well as later case law, in support of the government's position.

Between 1850 and 1871, Congress subsidized railroad construction through individual, large grants of public land. *See Great N. Ry. Co. v. United States*, 315 U.S. at 273. These grants eventually met with much public disapproval. *See id.* Responding to public criticism, in 1871, Congress changed its policy toward land grants for railroad companies. Still wishing to "encourage development of the Western vastnesses," yet unwilling to provide direct grants of land to railroad companies, Congress initiated a policy by which it passed special acts for designated railroad companies, granting only individual "rights-of way" over public land. *Id.* at 274, 62 S.Ct. 529. Granting railroads only a "right-of-way" for railroad purposes through and over federal lands, instead of granting whole land parcels, represented "a great shift in congressional policy." *See United States v. Union Pac. R.R. Co.*, 353 U.S. at 119, 77 S.Ct. 685. This policy

change was crystallized in a House Resolution passed in March, 1872, which stated: "*Resolved*, That in the judgment of this House the policy of granting subsidies in public lands to railroads and other corporations ought to be discontinued, and that every consideration of public policy and equal justice to the whole people requires that the public lands should be held for the purpose of securing homesteads to actual settlers, and for educational purposes, as may be provided by law." Cong. Globe, 42d Cong., 2d Sess., at 1585 (1872) (emphasis in original). Thus, after 1871, outright grants of public lands were discontinued, and Congress began a policy of making individual, specialized right-of-way grants to specific railroad companies. Eventually, however, enacting special legislation for individual railroad companies became burdensome, and led to the passage of the General Railroad Right of Way Act of 1875. *See Great N. Ry. Co. v. United States*, 315 U.S. at 275, 62 S.Ct. 529.

Although many years after the 1875 Act and three decades after the 1892 land patent was issued to Mr. Cowie, the nature of the property interest retained by the United States when granting a right-of-way to a railroad under the 1875 Act was addressed in a statute titled the Abandoned Railroad Right of Way Act of 1922, Act of Mar. 8, 1922, c. 94, 42 Stat. 414 (codified at 43 U.S.C. § 912). Specifically, 43 U.S.C. § 912, titled "Disposition of abandoned or forfeited railroad grants," provides that:

Whenever public lands of the United States have been or may be granted to any railroad company for use as a right-of-way for its railroad or as sites for railroad structures of any kind, and use and occupancy of said lands for such purposes has ceased or shall hereafter cease, whether by forfeiture or by abandonment by said railroad company declared or decreed by a court of competent jurisdiction or by Act of Congress, then and thereupon all right, title, interest, and estate of the United States in said lands shall, except such part thereof as may be embraced in a public highway legally established within one year after the date of said decree or forfei-

ture or abandonment be transferred to and vested in any person, firm, or corporation, assigns, or successors in title and interest to whom or to which title of the United States may have been or may be granted, conveying or purporting to convey the whole of the legal subdivision or subdivisions traversed or occupied by such railroad or railroad structures of any kind as aforesaid, except lands within a municipality the title to which, upon forfeiture or abandonment, as herein provided, shall vest in such municipality, and this by virtue of the patent thereto and without the necessity of any other or further conveyance or assurance of any kind or nature whatsoever: *Provided,* That this section shall not affect conveyances made by any railroad company of portions of its right-of-way if such conveyance be among those which have been or may after March 8, 1922, and before such forfeiture or abandonment be validated and confirmed by any Act of Congress; nor shall this section affect any public highway on said right-of-way on March 8, 1922: *Provided further,* That the transfer of such lands shall be subject to and contain reservations in favor of the United States of all oil, gas, and other minerals in the land so transferred and conveyed, with the right to prospect for, mine, and remove same.

43 U.S.C. § 912 (emphasis in original).

The defendant argues that the language in the 1922 Act, which establishes ownership rights in abandoned railroad rights-of-way in the owners of the adjacent property traversed by them, indicates that Congress was affirming its understanding that the United States had a reversionary interest in the rights-of-way, even where the whole of the land traversed by the right-of-way had been subsequently patented. Defendant argues that, "[h]ad the United States retained no interest in the rights-of-way post-patent, no affirmative action by Congress to convey the right to the surrounding landowner would have been required." The court disagrees.

The 1922 Act was restating the obvious conclusion regarding the language of the 1875 Act and other right-of-way statutes that, in the absence of additional language, a

right-of-way through public lands allowed for a limited use and did not reserve any fee type interests or reversionary rights as part of that right-of-way. It would appear that the language of the 1922 Act was intended to address, clarify, and resolve issues created by the imprecise language employed by the courts on this subject in the early part of the twentieth century, as is discussed more fully below. In the alternative, it has been suggested that the 1922 Act applied only to pre-1871 grants to railroad companies because prior to that date railroad companies were issued outright land grants, as opposed to the rights-of-way granted to railroad companies after that date. *See Great N. Ry. Co. v. United States,* 315 U.S. at 279, 62 S.Ct. 529.

In the case currently before the court, the defendant concedes that "if the alleged railroad abandonment had taken place a decade before plaintiffs allege it did, in 1998, plaintiffs would have received the United States' reversionary interest in the Lot 4 right-of-way," because 43 U.S.C. § 912, as quoted above, expressly provides that any interest held by the United States is conveyed to the adjacent landowner when a railroad abandons its right-of-way. In 1988, however, Congress enacted the National Trails System Improvements Act of 1988, Pub.L. No. 100–470, 102 Stat. 2281, 16 U.S.C. § 1248(c-f) to become part of the National Trails System Act, 16 U.S.C. §§ 1241 *et seq.* Defendant argues that since 16 U.S.C. § 1248(c) modified the 1922 Act, 43 U.S.C. § 912, as quoted above, the plaintiffs cannot claim an interest in the underlying land, over which the right-of-way passed. Section 1248(c) states:

Commencing upon October 4, 1988, any and all right, title, interest, and estate of the United States in all rights-of-way of the type described in section 912 of Title 43, shall remain in the United States upon the abandonment or forfeiture of such rights-of-way, or portions thereof, except to the extent that any such right-of-way, or portion thereof, is embraced within a public highway no later than one year after a determination of abandonment or forfeiture, as provided under such section.

16 U.S.C. § 1248(c). According to the defendant, the enactment of 16 U.S.C. § 1248(c) in

1988 confirmed that Congress had intended to retain a reversionary interest when it granted railroad rights-of-way.

Therefore, the challenge for this court is to reconcile the language authorizing railroad rights-of-way in the General Railroad Right of Way Act of 1875, 43 U.S.C. § 934 *et seq.,* the language of the Abandoned Railroad Right of Way Act of 1922, 43 U.S.C. § 912, the language of the National Trails System Improvements Act of 1988, 16 U.S.C. § 1248(c), and the words of the land patent given to Mr. Cowie in 1892. At issue is whether the 1988 legislation can have retroactive effect on the transfer of land rights which occurred years earlier, taking into account the statutes, the land patent and ensuing court decisions. This court is of the opinion that subsequent legislation (in the 1988 amendment) should not be applied to the 1875 Act which, it appears, intentionally omitted any words to create a reversionary right in the United States in grants of railroad rights of way, especially in light of the clarifying legislation in the 1922 Act, which specifically addressed the issue.

As noted above, the problem of how to define the nature of the interest granted to railroad companies under federal land grants has been complicated by the use of loose, interchangeable terminology for property terms of art and by later legislation which defendant argues has retroactive impact. In 1903, after the 1892 land transfer to Mr. Cowie, the Supreme Court interpreted a pre–1871 railroad right-of-way Act and stated that pre–1871 railroad rights-of-way passed title to the land itself, in the form of a "limited fee." *See Northern Pac. Ry. Co. v. Townsend,* 190 U.S. 267, 271, 23 S.Ct. 671, 47 L.Ed. 1044 (1903). In *Townsend,* the Supreme Court reviewed a railroad right-of-way and held that, under a specific statutory land grant to the Northern Pacific Railroad Company in 1864, Act of July 2, 1864, 13 Stat. 365, ch. 217 (the 1864 Act), the grant was "a limited fee." [4] *See id.* In *Townsend,* as in this case, homesteaders were given patents to land through which the railroad company's right-of-way traversed. In *Townsend,* however, the homesteaders attempted to gain possession of the right-of-way through adverse possession after cultivating land within the boundaries of the railroad company's right-of-way. *Id.* at 269, 23 S.Ct. 671. The Court, in rejecting the application of adverse possession, held that the interest given to the railroad company by the United States was "a limited fee, made on an implied condition of reverter in the event that the company ceased to use or retain the land for the purpose for which it was granted." *Id.* at 271, 23 S.Ct. 671.

Twelve years after *Townsend,* in *Rio Grande Western Railway Company v. Stringham,* 239 U.S. 44, 47, 36 S.Ct. 5, 60 L.Ed. 136 (1915), the United States Supreme Court addressed a right-of-way enabled by the 1875 Act and transferred the same "limited fee" concept to railroad rights-of-way issued under the 1875 Act, which, unlike earlier Acts, did not grant the railroads a fee type interest, but instead stated: "The right of way through the public lands of the United States is granted to any railroad company duly organized under the laws of any State or Territory, except the District of Columbia, or by the Congress of the United States, which shall have filed with the Secretary of the Interior a copy of its articles of incorporation ...." Act of 1875, at § 1. In *Rio Grande Western Railway Company v. Stringham,* the railroad company was granted a right-of-way under the 1875 Act and Mr.

4. In pertinent part, the 1864 Act states:
   That there be, and hereby is, granted to the "Northern Pacific Railroad Company," its successors and assigns for the purpose of aiding in the construction of said railroad and telegraph line to the Pacific coast ... every alternate section of public land, not mineral... on each side of said railroad line ... through the territories of the United States ... and whenever on the line thereof, the United States have full title, not reserved, sold, granted, or otherwise appropriated, and free from preemption, or other claims or rights, at the time the line of said road is definitely fixed ....
   Act of 1864, at § 3. Additionally, the 1864 Act clearly gave the Northern Pacific Railroad Company patents to the land over which the company built its railway. The 1864 Act stated: "That whenever said 'Northern Pacific Railroad Company' shall have twenty-five consecutive miles of any portion of said railroad ... *patents of land, as aforesaid, shall be issued to said company* ...." Act of 1864, at § 4 (emphasis added).

Stringham was a successor in interest to a mining patent given to a previous owner by the United States. Resolving a quiet title dispute between Mr. Stringham, who claimed possession through the mining patent, and the railroad company, which claimed title under the 1875 Act, the Court stated: "The right of way granted by this and similar acts is neither a mere easement, nor a fee simple absolute, but a limited fee, made on an implied condition of reverter in the event that the company ceases to use or retain the land for the purposes for which it is granted, and carries with it the incidents and remedies usually attending the fee." *Rio Grande W. Ry. Co. v. Stringham*, 239 U.S. at 47, 36 S.Ct. 5 (1915) (citing *Western U. Tel. Co. v. Pennsylvania R. Co.*, 195 U.S. 540, 570, 25 S.Ct. 133, 49 L.Ed. 312 (1904); *Northern Pac. R. Co. v. Townsend*, 190 U.S. at 271, 23 S.Ct. 671; *United States v. Michigan*, 190 U.S. 379, 398, 23 S.Ct. 742, 47 L.Ed. 1103 (1903); *New Mexico v. United States Trust Co.*, 172 U.S. 171, 183, 19 S.Ct. 128, 43 L.Ed. 407 (1898)).

The result in *Townsend* and *Stringham*, although the right-of-way derived from two very different statutes, one which granted patents and a limited fee interest (the 1864 Act), and one which only granted a right-of-way "through the public lands of the United States" (the 1875 Act), was to define the railroad right-of-way in the nature of a property interest representing something between a fee simple and a mere easement, leaving the railroad with exclusive use of the property, and the United States with a reversionary interest in the land. The "limited fee" language also was applied to the 1875 Act in a number of cases following *Stringham*. *See, e.g., Noble v. Oklahoma City*, 297 U.S. 481, 494, 56 S.Ct. 562, 80 L.Ed. 816 (1936) ("Assuming, for the sake of argument, that the act of 1888 granted the railroad a base or limited fee, as does the general railroad act of March 3, 1875 . . . ."); *Choctaw, O & G.R. Co. v. Mackey*, 256 U.S. 531, 538, 41 S.Ct. 582, 65 L.Ed. 1076 (1921) (quoting *Stringham* for the proposition that the railroad's interest is "neither a mere easement, nor a fee simple absolute, but a limited fee, made on an implied condition of reversion in the event that the company ceases to use or

retain the land for the purposes for which it is granted . . . .").

The plaintiffs, Mr. and Mrs. Beres, argue, however, that "the starting point of the legal analysis" should be the more recent United States Supreme Court decision in *Great Northern Railway Company v. United States*, decided in 1942. The ruling in *Great Northern* specifically rejected the Court's earlier reasoning in *Stringham*, and was specific to the 1875 Act. *See Great N. Ry. Co. v. United States*, 315 U.S. at 279, 62 S.Ct. 529. In *Great Northern*, the Supreme Court found that the 1875 Act granted railroads "only an easement." *Id.* at 277, 62 S.Ct. 529 ("That [the railroad company] has only an easement in its rights of way acquired under the Act of 1875 is therefore clear from the language of the Act, its legislative history, its early administrative interpretation and the construction placed upon it by Congress in subsequent enactments.").

In *Great Northern*, the United States pursued an injunction to stop a railroad company from drilling for or removing gas, oil and other materials underlying an 1875 Act railroad right-of-way. *See id.* at 270, 62 S.Ct. 529. The court found that: "Since petitioner's right of way is but an easement, it has no right to the underlying oil and minerals." *Id.* at 279, 62 S.Ct. 529. In interpreting the railroad's right-of-way as an easement, the Supreme Court in *Great Northern* found "especially persuasive" the language of Section 4 of the 1875 Act. *Id.* at 271, 62 S.Ct. 529. Section 4 requires railroad companies to "file with the register of the land office for the district where such land is located a profile of its road; and upon approval thereof by the Secretary of the Interior the same shall be noted upon the plats in said office" and that "thereafter all such lands over which such right-of-way shall pass shall be disposed of subject to such right-of-way . . . ." Act of 1875, at § 4. The Supreme Court held that "[t]his reserved right to dispose of the land subject to the right-of-way is wholly inconsistent with the grant of a fee" and that " '[a]pter words to indicate the intent to convey an easement would be difficult to find.' " *Great N. Ry. Co. v. United States*, 315 U.S. at 271,

62 S.Ct. 529 (quoting *MacDonald v. United States*, 119 F.2d 821, 825 (9th Cir.1941)).

To assist in its interpretation of the 1875 Act, and to identify the congressional intent in passing that Act, the *Great Northern* Court reviewed subsequent issuances addressing the rights obtained by railroads under the 1875 Act. The Court in *Great Northern* reviewed the subsequent administrative and legislative history of the 1875 Act, noting that an early circular and an 1892 regulation issued by those responsible for administering the Act discussed the grant under the 1875 Act as an "easement," whereas a 1904 circular discussed the right as a "base or qualified fee." *Great N. Ry. Co. v. United States*, 315 U.S. at 275, 62 S.Ct. 529. The *Great Northern* Court, however, specifically rejected the 1904 interpretation because it resulted from the description in *Townsend* of a right-of-way being a "limited fee." *Id.* at 276, 62 S.Ct. 529. The Court also rejected administrative constructions defining an 1875 Act right-of-way as a "limited fee," "since it was impelled by what we regard as inaccurate statements in the *Stringham* case." *Id.* The *Great Northern* Court also addressed a 1906 legislative Act by taking note of a House Committee Report, which stated that "the right originally conferred and as proposed to be protected by this bill simply grants an easement or use for railroad purposes." *Id.* at 277, 62 S.Ct. 529. In addition, the *Great Northern* Court quoted the portion of the House Committee Report which stated that: "Under the present law [the 1875 Act], whenever the railroad passes through a tract of public land the entire tract is patented to the settler or entryman, subject only to this easement." *Id.* at 277, 62 S.Ct. 529 (quoting H.R. Rep. No. 4777, 59th Cong., 1st Sess., at 2 (Ser. No. 4908) (1906)). Thus, the discussion by the United States Supreme Court supports the conclusion that when the government patented land to a settler such as William H. Cowie, the United States gave up all its interest in the land, including any reversionary interest.

It is also clear in the Supreme Court's later decision in *Great Northern* that the United States Supreme Court specifically overturned the *Stringham* line of cases, which had previously described the railroads' interest as a "limited fee." *See id.* at 278–79, 62 S.Ct. 529. The Supreme Court stated that:

> The conclusion [in *Stringham*] that the railroad was the owner of a "limited fee" was based on cases arising under the land grant acts passed prior to 1871 and it does not appear that Congress' change of policy after 1871 was brought to the Court's attention. That conclusion is inconsistent with the language of the Act, its legislative history, its early administrative interpretation and the construction placed on it by Congress in subsequent legislation. We therefore do not regard it as controlling.

*Great N. Ry. Co. v. United States*, 315 U.S. at 279, 62 S.Ct. 529.

In overturning the *Stringham* reasoning in *Great Northern*, the Supreme Court referred to the shift in congressional policy away from granting railroad companies straight fee interests. According to the historical and legislative history discussed in the *Great Northern* decision, after 1871, outright grants of public lands to private railroad companies was discontinued, in favor of grants of rights-of-way. *See id.* at 273–78, 62 S.Ct. 529. As a result, the Supreme Court found in *Great Northern* that "[t]he Act of March 3, 1875, from which the [railroad's] rights stem, clearly grants only an easement, and not a fee." *Id.* at 271, 62 S.Ct. 529. Since the Supreme Court's decision in *Great Northern*, cases have generally defined the right-of-way interest in 1875 Act as an easement. Unfortunately, however, the Supreme Court, in *Great Northern*, and in subsequent cases, has not provided a more specific definition of the term "easement" in the 1875 Act context.[5]

---

5. The definitional problems underlying the use of the terms "limited fee" and "easement" were addressed by the United States Court of Appeals for the Tenth Circuit in *Wyoming v. Udall*, which stated that:

> For the purposes of this case, we are not impressed with the labels applied to the title of the railroads in their rights-of-way across the public lands of the United States. The concept of "limited fee" was no doubt applied in *Townsend* because under the common law an easement was an incorporeal hereditament which did not give an exclusive right of possession. With the expansion of the meaning of ease-

The United States Supreme Court overturned the *Stringham* line of cases, despite acknowledging that "any ambiguity in a grant is to be resolved favorably to a sovereign grantor—'nothing passes but what is conveyed in clear and explicit language.' " *Great N. Ry. Co. v. United States,* 315 U.S. at 272, 62 S.Ct. 529 (quoting *Caldwell v. United States,* 250 U.S. 14, 20, 21, 39 S.Ct. 397, 63 L.Ed. 816 (1919)).

As the instant case demonstrates, the policy interests of the United States sometimes shift. Whereas the 1875 Act legislative history suggests that the railroads should be given only a right-of-way through the public lands so the public land can be reserved for homesteading by settlers and for educational purposes, the government currently urges use of the same land for the Rails to Trails program. Moreover, the United States Supreme Court in *Great Northern* used the presumption in favor of the government to establish the railroad right-of-way as an easement, whereas the government now is attempting to use the presumption in its favor to define the right-of-way as in the nature of a fee, with a reversionary right. The 1875 Act, however, is not ambiguous, rather, the 1875 Act is silent regarding a reversionary right in the government's favor and uses the clear phrase "right of way through the public lands of the United States . . . ." Act of 1875, § 1.

In response to plaintiffs' reliance on *Great Northern* as "controlling precedent," the defendant, despite clear language in the case overruling the *Stringham* line of cases, argues that the plaintiffs attempt to gain more from the *Great Northern* case than it fairly provides. According to the defendant, the holding of *Great Northern* is limited to: "[s]ince [the railroad's] right-of-way is but an easement, it has no right to the underlying oil and minerals." Furthermore, the defendant argues that while the Supreme Court may have re-labeled the interests in *Great Northern* from a "limited fee" to an "easement," that redesignation merely narrowed the interests given to the railroad, without

fundamentally changing the government's reasons for making the railroad grants or the government's retained interests. The challenge in *Great Northern* did result from a dispute as to whether the railroad had obtained any rights to the oil and minerals as a result of its right-of-way, and the *Great Northern* Court did not specifically address the question of reversionary rights after the government had transferred the land to a private party. Nonetheless, the Supreme Court in *Great Northern* specifically defined the property interest held by the railroad as a result of its right-of-way as a mere "easement." *Great N. Ry. Co. v. United States,* 315 U.S. at 271, 62 S.Ct. 529 ("The Act of March 3, 1875, from which petitioner's rights stem, clearly grants only an easement, and not a fee.").

Although not addressed by the United States Supreme Court, some Circuit courts in the federal system more recently have found that the "National Trails System Improvement[s] Act of 1988, 16 U.S.C. § 1248(c), modifies [43 U.S.C.] § 912 to the extent that now those lands *not* converted to public highways within one year revert to the United States and not private landowners." *Mauler v. Bayfield County,* 309 F.3d 997, 999 (7th Cir.2002) (emphasis in original) (citing the now rejected rationale employed in *Townsend* and *Stringham*), *cert. denied,* 538 U.S. 1032, 123 S.Ct. 2076, 155 L.Ed.2d 1061 (2003). The court in *Mauler* wrote: "Clearly Congress assumed the United States possessed a reversionary interest in railroad rights of way, else it would make little sense for Congress to have passed laws like § 912, 913 & 1248(c) to dispose of land the federal government did not own." *Id.* at 1002. The United States Court of Appeals for the Ninth Circuit, addressing property rights granted in 1862 and 1864, also concluded that 43 U.S.C. § 912 applies to both pre-and post–1875 Act cases. *See Vieux v. East Bay Reg'l Park Dist.,* 906 F.2d 1330, 1335 (9th Cir.) ("Although the U.S. Supreme Court has not addressed whether the change in 1871 in the

ment to include, so far as railroads are concerned, a right in perpetuity to exclusive use and possession the need for the "limited fee" label disappeared.

*Wyoming v. Udall,* 379 F.2d at 640.

nature of the grants, from 'limited fee with right of reverter' to 'exclusive easement,' affects the application of § 912, we agree with the district court's Memorandum and Order of March 2, 1987, in that the statute applies to grants both before and after 1871."), *cert. denied*, 498 U.S. 967, 111 S.Ct. 430, 112 L.Ed.2d 414 (1990).

In *Marshall v. Chicago and Northwestern Transportation Company*, 31 F.3d 1028 (10th Cir.1994), the court also applied 43 U.S.C. § 912 to the 1875 Act. In *Marshall*, the right-of-way granted to the railroad company through public land occurred in 1905 under the 1875 Act, and the United States Court of Appeals for the Tenth Circuit wrote:

> In this regard, we note that the statute [43 U.S.C. § 912] is designed to cover the situation where the United States grants a railroad company a right-of-way over public lands and thereafter conveys or purports to convey to another "the whole of the legal subdivision or subdivisions traversed or occupied by such railroad or railroad structures ...." That would, to us, appear to cover the instant case.

*Marshall v. Chicago and N.W. Transp. Co.*, 31 F.3d at 1032.

The landowners in *Marshall* argued that, by its own terms, 43 U.S.C. § 912 applied only when the United States had some "right, title, interest and estate" in the underlying land which could revert to the patentee of that servient estate, and that in its land patent to Marshall's predecessor in interest, the United States had retained no interest in the land, other than in the minerals. *Id.* at 1032. The Tenth Circuit rejected the argument, also offered by the plaintiffs in this case, that the United States retained no reversionary interest when the government subsequently patents land to a private or other party after previously granting a railroad right-of-way over that land, because 43 U.S.C. § 912, as modified by 16 U.S.C. § 1248(c), applies to rights-of-way granted under the 1875 Act, as well as the earlier acts that granted land to railroads for railroad purposes.

In *Idaho v. Oregon Short Line Railroad Company*, the United States District Court for the District of Idaho stated that:

These statutes would be rendered null if this Court were to find them inapplicable to 1875 Act rights-of-way, for they were specifically enacted to dispose of the United States' retained interest in 1875 Act rights-of-way. *See* H.R. 217 and 843, *supra.* In enacting these statutes, Congress clearly felt that it had some retained interest in railroad rights-of-way. The precise nature of that retained interest need not be shoe-horned into any specific category cognizable under the rules of real property law.... Regardless of the precise nature of the interest, Congress clearly believed that it had authority over 1875 Act railroad rights-of-way. Sections 912, 913 and 316 evince an intent to ensure that railroad rights-of-way would continue to be used for public transportation purposes, primarily for highway transportation.

*Idaho v. Oregon Short Line R.R. Co.*, 617 F.Supp. at 212. The court reasoned that, even if the property interest was in the nature of an easement, Congress:

> had authority, by virtue of its broad power over interstate commerce, to grant such easements subject to its own terms and conditions—which were to preserve a corridor of public transportation, particularly the railroad transportation in order to facilitate the development of the "Western vastness." Congress could pre-emptor override common-law rules regarding easements, reversions, or other traditional property interests. In other words, even if the 1875 Act granted only an easement, it does not necessarily follow that Congress would or did not intend to retain an interest in that easement.

*Idaho v. Oregon Short Line R.R. Co.*, 617 F.Supp. at 212.

At the state level, there also has been recognition of a reversionary interest in the United States. *See, e.g., Barney v. Burlington N. R.R. Co.*, 490 N.W.2d at 731. The Supreme Court of South Dakota stated: "the United States Government retained a reversionary interest in railroad rights-of-way, including those granted post 1871 and § 912 applies to the right-of-way granted to the Railroad." *Id.*

To the contrary, however, in *City of Aberdeen v. Chicago and North Western Transportation Company*, 602 F.Supp. 589 (D.S.D. 1984), the United States District Court for the District of South Dakota disagreed and wrote:

> This court believes it equally clear that *Great Northern* renders Section 912 inapplicable to this case. Section 912 was enacted when Congress and the courts erroneously believed a right-of-way was a limited fee with the United States holding a reversionary interest.... As a mere easement, once a railroad ceases using for railroad purposes a right-of-way granted after 1871, it disappears and the underlying landowner has the use of property he already owns. As of the date the United States patents the underlying land, it has no right, title, interest or estate to be transferred under Section 912....Applying this analysis to the facts of this case, when the United States granted Dakota Central a right-of-way, it granted only an easement. In 1890, when the United States patented the underlying land to Andrew Melgaard, it conveyed to him all of the land subject only to the railroad's right to use and possess its right-of-way.

*City of Aberdeen v. Chicago & N.W. Transp. Co.*, 602 F.Supp. at 593.

Of significance is that none of the cases which have found a reversionary interest in the United States analyzed the words of the 1875 Act, or an intervening land patent from the United States, to determine the nature of the land interest before and after a railroad right-of-way grant. Instead, the cases have relied only on language or legislative history of later congressional enactments and other court opinions to explain and interpret the words and effect of the 1875 Act. Moreover, all of these explanations included in statutes and cases which acknowledge a reversionary interest in the United States occurred after the United States had issued a land patent to Mr. Cowie in 1892. If these subsequent statutory directions or court interpretations were to be followed, they would retroactively impact the property rights Mr. Cowie thought he had obtained, based on a reasonable, contemporaneous understanding of the 1875 Act and the land patent issued to him.

In addition to relying on the words of the 1875 Act and the language in *Great Northern*, the plaintiffs have cited to several additional sources to support their argument. In particular, the plaintiffs relied upon a Department of Interior Regulation, 43 C.F.R. § 2842.1(a), repealed in 1980, as well as certain Department of Interior decisions, to argue that the interest granted to the railroads under the 1875 Act was only an easement, not in the nature of a fee interest. According to plaintiffs, 43 C.F.R. § 2842.1 described the nature of the grant under the 1875 Act as follows:

> A railroad company to which a right-of-way is granted does not secure a full and complete title to the land on which the right-of-way is located. It obtains only the right to use the land for the purposes for which it is granted and for no other purpose, and may hold such possession, if it is necessary to that use, as long and only as long as that use continues. The Government conveys the fee simple title in the land over which the right-of-way is granted to the person to whom the patent issues for the legal subdivision on which the right-of-way is located, and such patentee takes the fee subject only to the railroad company's right to use and possession.

43 C.F.R. § 2842.1(a) (1979). This regulation was repealed in 1980, and a review of the regulation's history provides little insight into the purpose of the repeal, except that the repeal coincided with the passage of regulations under Title V of the Federal Land Policy and Management Act of 1976, which repealed the Act of 1875. *See* 45 Fed.Reg. 44537 (July 1, 1980) (repealing 43 C.F.R. Part 2840); 44 Fed.Reg. 58,106 (Oct. 9, 1979).

Plaintiffs also cite a number of Department of Interior decisions to support their argument that the right-of-way granted to the railroad was a simple easement, not a fee interest with a reversionary right. For example, the plaintiffs cite to *Fremont, Elkhorn and Missouri Valley Railway Company*, which was also cited in *Great Northern*, and states: "That the right of way granted by the [1875 Act] is a mere easement cannot

be questioned, for the fourth section provides that 'thereafter all such lands, over which such right of way shall pass, shall be disposed of, subject to such right of way.'" *Fremont, Elkhorn & Missouri Valley Ry. Co.*, 19 Pub. Lands Dec. 588, 590, 1894 WL 1179 (Dec. 28, 1894). The plaintiffs argue that "the law in the 1890's appeared clear that only an easement was granted to railroad companies under the 1875 Act" and that "this view of the property interest conveyed under the 1875 Act was still intact at least until March of 1903." The plaintiffs go on to cite the Interior decision in *John W. Wehn,* 32 Pub. Lands Dec. 33, 33, 1903 WL 864, at *1 (Mar. 3, 1903), which states that "Rights of way under the acts of March 3, 1875, and March 3, 1891, are mere easements, and an applicant to purchase lands over which they pass, under the timber and stone act, will be required to pay for the entire area of the legal subdivisions applied for, notwithstanding such rights of way." Finally, the plaintiffs cite to *Amerada Hess Corporation,* 83 Interior Dec. 194, 24 IBLA 360, 1976 WL 25279 (Apr. 27, 1976) to support their argument that, "where a right of way under the 1875 Act is followed by a patent, the United States retains no further interest in the land." In *Amerada Hess,* the Department of Interior stated that: "The Secretary of the Interior does not have authority under the Act of May 21, 1930, to dispose of deposits of oil and gas underlying a right-of-way granted pursuant to the Act of Mar. 3, 1875, with respect to lands traversed by the right-of-way which were later patented without any reservation for minerals." *Id.* at 203; *see also Florida Cent. & Peninsular R.R. Co.,* 22 Pub. Lands Dec. 451, 453, 1896 WL 1235, at *3 (1896) (construing an 1856 Act, stating that: "A statutory grant of a railroad right of way is a grant of an easement, and the lands over which the right of way is located may be disposed of by patent to others, subject to whatever right the company may have in the same.").

The defendant offers a variety of responses, including that the Department of Interior construed all railroad rights-of-way as easements, whether granted before or after 1871, and cites *Northern Pacific Railway Company v. Townsend,* 190 U.S. at 271, 23

S.Ct. 671, to argue that this interpretation was incorrect. The defendant also dismisses the Department of Interior decisions, arguing that early Interior decisions improperly applied common law principles. In addition, defendant points to inconsistencies in the Department of Interior's position, noting that, unlike an agency "position consistently held," the decisions plaintiffs cite cannot be viewed as controlling. *See National Fed'n of Fed. Employees v. Dep't of Interior,* 526 U.S. 86, 108, 119 S.Ct. 1003, 143 L.Ed.2d 171 (1999) ("[W]hen an agency alters its interpretation of a statute, its revised interpretation may be entitled to less deference than a position consistently held."). The defendant also cites a Department of Interior decision that states that, "Under the 1875 Act, railroads were granted an 'easement'. The scope of this easement, unlike an ordinary common-law easement, is an interest tantamount to fee ownership . . . ." *Proposed Installation of MCI Fiber Optic Communication Line Within Southern Pacific Transportation Companies' Railroad Right-of-way,* 96 Int. Dec. 439, 450, 1989 WL 434834, at *10 (Jan. 5, 1989). Although the regulation at 43 C.F.R. § 2842.1 was repealed in 1980, before the passage of 16 U.S.C. § 1248(c) in 1988, it is noteworthy that the decision in *Proposed Installation of MCI Fiber Optic Communication Line Within Southern Pacific Transportation Companies' Railroad Right-of-way,* cited by the defendant, was issued by the Department of Interior after the 1988 passage of 16 U.S.C. § 1248(c), which attempted to retroactively change the status of the abandoned railroad right-of-way ownership interest. Up until that point, no inconsistencies by the Department of Interior were cited by the defendant.

With knowledge of the legislative and case law background discussed above, this court is charged with determining whether the United States retained a reversionary interest when it granted the Seattle Railroad Company a right-of-way pursuant to the 1875 Act and after the federal government issued a land patent to William H. Cowie in 1892. The 1875 Act granted the Seattle Railroad Company "[t]he right of way through the

public lands of the United States ...." Act of 1875, at § 1. There was no mention in the 1875 Act of an underlying fee interest of any kind. An easement is generally understood to carry with it no right to exclusive use and occupancy of the underlying land. *See* 4 R. Powell, Real Property § 34.02[1] (M. Wolf ed. 2002) ("Whenever an easement exists, the servient owner is privileged to use the servient land in any way not inconsistent with the limited use permitted the easement owner."). Furthermore, "[a]n easement is not a possessory estate of freehold, but merely gives the easement holder a right to make use of the land over which the easement lies for the purposes for which it was granted." *Preseault v. United States,* 100 F.3d at 1545 (citing 7 Thompson on Real Property § 60.02(c), (d) (David A. Thomas ed., 1994)). In this case, the purpose of the railroad easement was to conduct railroad operations.

This court also cannot ignore the words of the United States Supreme Court that "nothing passes but what is conveyed in clear and explicit language," *Great N. Ry. Co. v. United States,* 315 U.S. at 272, 62 S.Ct. 529, or the Supreme Court's description that the property interest granted in the rights-of-way "through the public lands" to the railroads was "only an easement." *Id.* at 277, 62 S.Ct. 529 (quoting *Caldwell v. United States,* 250 U.S. at 20, 39 S.Ct. 397). Based on its own review of the 1875 Act, the Supreme Court has stated that "it is improbable that Congress intended by it [the 1875 Act] to grant more than a right of passage, let alone mineral riches." *Id.* at 275, 62 S.Ct. 529. According to the Supreme Court in *Great Northern,* "the Act of March 3, 1875 ... clearly grants only an easement, and not a fee .... [T]he right granted is one of use and occupancy only." *Great N. Ry. Co. v. United States,* 315 U.S. at 271, 62 S.Ct. 529.

Under the facts at issue in the case currently before this court, when the United States granted a right-of-way to the Seattle Railroad Company, pursuant to the 1875 Act, it granted an easement to the railroad for railroad purposes, in keeping with the purpose of the 1875 Act. The 1875 Act indicated that future dispositions of such lands shall be disposed of "subject to" the right-of-way granted to a railroad. Act of 1875, at § 4. The language of the 1875 Act makes no statement reserving any property interest in the United States. Thus, when the United States granted a land patent to William H. Cowie in 1892, the land transfer was subject only to the existing railroad right-of-way by operation of the specific words of the 1875 Act. The only reservations made by the United States in the land patent to William H. Cowie were the mineral and water rights described above. As the Supreme Court has stated, "when a patent issues in accordance with governing statutes, all title and control of the land passes from the United States." *Swendig v. Washington Water Power Co.,* 265 U.S. at 331, 44 S.Ct. 496 (citing *United States v. Schurz,* 102 U.S. at 396). Therefore, when the United States issued a land patent to William H. Cowie in 1892, it transferred to Mr. Cowie all property interests in the land other than those interests specifically reserved in the land patent quoted above. The statutory words of the 1875 Act are consistent with this result.

A fundamental precept of our property ownership system and system of laws includes certainty of ownership upon purchase, whether by receipt of a land patent from the federal government or a deed from private party. The average citizen, the reasonable man, expects that a contract to transfer land, whether from a public or private owner, is effective and will not be retroactively changed many years after the land transfer. The Fifth Amendment to the United States Constitution addresses those situations in which the sovereign exercises its legal authority to take property for public purposes, but requires "just compensation" if such a taking occurs. In this court, neither party to this litigation argues that the Rails to Trails program does not fulfill a laudatory purpose, nor that the federal government cannot take the property for that purpose. Indeed, the United States Supreme Court has upheld the Rails to Trails program in part because a Tucker Act remedy is available. *See Preseault v. Interstate Commerce Comm'n,* 494 U.S. at 12, 110 S.Ct. 914 (concluding that the National Trails System Act Amendments of 1983 "did not withdraw the Tucker Act reme-

dy"). The United States Court of Appeals for the Federal Circuit has stated that, "[i]t is elementary law that if the Government uses . . . an existing railroad easement for purposes and in a manner not allowed by the terms of the grant of the easement, the Government has taken the landowner's property for the new use." *Toews v. United States,* 376 F.3d at 1376. Similarly, the issue raised by Mr. and Mrs. Beres in this court is whether or not a compensable taking has occurred and whether or not the plaintiffs are entitled to such compensation.

The federal government had ample opportunity to preserve a reversionary interest in the right-of-way granted to railroad companies under the 1875 Act, but failed to do so. Congress could have reserved a reversionary interest by including a reversionary right in the 1875 Act itself. The 1875 Act contains no such language. The government also could have reserved a reversionary interest in the land patent issued to William H. Cowie in 1892, and once again did not do so. When 43 U.S.C. § 912 was passed in 1922, Congress, perhaps in response to confusing and misleading language included in federal court decisions, reconfirmed the absence of such a reversionary interest in the United States and the congressional intent, as indicated in the legislative history of the 1875 Act, that the land should be reserved for homesteaders and for educational purposes. When 16 U.S.C. § 1248(c) was passed in 1988, the federal government no longer held any reversionary rights in the land granted to Mr. Cowie for 43 U.S.C. § 912, as amended by 16 U.S.C. § 1248(c), to preserve. The United States' rights to the land at issue, other than the specifically reserved mineral and water rights reserved in the land patent conveyed to Mr. Cowie in 1892, ceased at that time. In sum, the United States had no reversionary interest that could be retained by the federal government when 16 U.S.C. § 1248(c) was enacted in 1988.

Retroactive legislation in favor of even a laudatory preservation program should not allow reassertion of property interests to the federal government regarding lands it had previously and intentionally disposed of to a private citizen, as in the land patent to William H. Cowie. Although the United States Supreme Court has determined that the federal government may initiate a program of converting abandoned railways to trails, it has also concluded that where the land is owned by private parties, if a taking occurs, those individuals must be compensated. *See Preseault v. Interstate Commerce Comm'n,* 494 U.S. at 23, 110 S.Ct. 914 ("The ICC may possess the power to postpone enjoyment of reversionary interests, but the Fifth Amendment and well established doctrine indicate that in certain circumstances the Government must compensate owners of those property interests when it exercises that power."). This court, therefore, finds that under the facts of the case currently before it, the United States does not hold a reversionary interest in the lands granted pursuant to the 1875 Act and later patented to William H. Cowie.

This result, however, by no means resolves the case before the court. There remain numerous issues to resolve before this court can determine if the plaintiffs are entitled to compensation, including resolution of the successor in title to the land and whether or not there was an abandonment. Neither of these issues were briefed by the parties in the motion for summary judgment presently before the court. Nor does the court's conclusion in this summary judgment proceeding direct that the trail that generated this dispute cannot be built, extended and maintained, or take a position on the numerous, affiliated law suits regarding the Lake Sammamish properties. By this decision, we have taken only one step in a series of steps to determine the property rights and damages claims at issue.

## CONCLUSION

For the reasons discussed above, this court holds that the United States did not retain a reversionary interest when it granted a right-of-way to the Seattle Railroad Company under the 1875 Act and subsequently issued a land patent to William H. Cowie in 1892. The court, therefore, **DENIES** the defendant's motion for summary judgment.

**IT IS SO ORDERED.**